**GENERAL AGGREGATES CORPORA-
TION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 6018.**

United States Court of Appeals
First Circuit.

Heard Nov. 7, 1962.

Decided Jan. 31, 1963.

Bertram H. Loewenberg, Boston, Mass., with whom Daniel Needham, Jr., Boston, Mass., Stephen A. Hopkins, Cohasset, Mass., and Sherburne, Powers & Needham, Boston, Mass., were on brief, for petitioner.

Stanton H. Zarrow, Atty., Dept. of Justice, with whom Louis F. Oberdorfer, Asst. Atty. Gen. and Lee A. Jackson and Meyer Rothwacks, Attys., Dept. of Justice, were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This petition to review a decision of the Tax Court raises the single ultimate question of whether the court's finding

that taxpayer received certain funds in 1951 and 1952 as dividends was incorrect, in whole or in part. Taxpayer, General Aggregates Corporation, is a Massachusetts corporation, having, at the period in question, 14,941 outstanding shares of Class A (preference) stock and 54,538 shares of Class B (common) stock. One George S. Wilbur owned 5,395 shares of the Class A stock, the balance being owned by 150 persons unrelated to him. In addition Wilbur owned 14,293 shares of Class B stock. 40,000 shares of Class B were owned by his wife, his son, and his daughter. Highland Sand and Gravel Company, Inc., another Massachusetts corporation, had outstanding 589 shares of Class A (preference) stock, of which 138 shares were owned by Wilbur, 311 shares by his family, and 140 shares by 21 persons unrelated. All of its 10,000 shares of Class B stock were owned by taxpayer. No dividends had been paid by Highland in twenty years, and cumulative arrearages on Class A, by December 31, 1952, were $94,000.[1] During the period in question Highland's accumulated earnings stood in the vicinity of $300,000. Taxpayer's assets, in addition to the Highland stock, on January 1, 1951, consisted essentially of a bank account in the amount of $60,000. Wilbur was the principal executive officer, and one of the three directors, of both companies.

During 1950 Wilbur conceived the notion of establishing a high-class restaurant, and leased certain real estate for that purpose. In May, 1951, he formed a corporation known as Chateau Montserrat, Inc., to operate the business. Prior to, and, again, after Chateau's incorporation he discussed with counsel the proposed ownership of its stock. Under the first plan Wilbur was to own 997 of 1,000 issued shares; under the other 499 shares, with 500 shares to be issued to a Miss Aarons, his former secretary. No shares were actually issued. However, on Chateau's books, kept by Wilbur, the entries show that taxpayer and Miss Aarons each owned 50 per cent of the stock. Taxpayer's half was paid for, in the amount of $5,000, by taxpayer, from its accumulated funds. Miss Aaron's was paid for by $3,500 similarly supplied by taxpayer and charged to Wilbur, and by $1,500 in corporate expenses allegedly paid by her. At the trial Miss Aarons testified to no such expenditures, said that she did not know she was a stockholder, and stated, in which she was corroborated by another witness, that Wilbur told her that he "would give [her] some shares" if the business was successful (which it never was).

Establishing the restaurant as a going concern eventually required the expenditure of $158,000 in addition to what had been paid in for the stock. In round numbers, $40,000 came from taxpayer's funds on hand on January 1, 1951; $90,000 came from taxpayer from funds received during 1951 and 1952 from Highland, and $28,000 came from Wilbur from moneys paid to him by Highland, and charged to his account, but thereafter charged on Highland's books (but not on taxpayer's) as payments to taxpayer. Some of all of these payments were made directly to Chateau; others were made to persons who had supplied labor or materials to Chateau. Wilbur entered all payments, in one manner or another, on the corporate books of taxpayer and/or Highland. Some entries, in addition to those already mentioned, he afterwards changed. It is impossible to find any consistent pattern, either in the original entries or in the changes. Only one thing is clear. No payment was ever denominated on the books as a dividend from Highland. The Commissioner, however, took the position that every payment originating from Highland was a dividend to taxpayer. The Tax Court agreed.

■ We, of course, recognize our obligation to accept all findings of the

---

1. There is a mystery as to the whereabouts of the "unrelated" Class A stockholders. The uncontroverted evidence was that all corporate notices mailed to them were returned marked "address unknown." However, no one disputes that this stock was validly issued and outstanding.

court supported by evidence. We accept the finding that taxpayer owned one half of Chateau's stock. The court did not state who owned the other half, except to say that it did not belong to Highland. This negative we also accept.[2] We do not find, in the court's opinion or otherwise, the "implication" that the government would have us draw that the court found that Wilbur did not beneficially own this other half. However, for present purposes we do not see that it makes any difference whether Miss Aarons owned it, in whole or in part, in her own right, or whether she was named as a straw for Wilbur.

The restaurant opened but was not a success. In November, 1952, Wilbur died. In January, 1953, Chateau was liquidated, realizing $1,400 over and above outstanding bills, other than the aforesaid advances or expenditures of $158,000 to the extent that these were obligations. This small balance was paid to Wilbur's estate, an event to which we attach no legal significance.

Most of the tax court's opinion is devoted to a recitation of the above and other, consistent, facts. The court, determining that the advances to taxpayer from Highland were not loans, concluded that they were taxable dividends. It based this on a finding that Wilbur did not intend that they should be repaid. This matter we will return to. It further determined that all payments made to Wilbur by Highland and by him applied to Chateau were also dividends to taxpayer because, through its stock interest, they accrued to taxpayer's "benefit." How it deduced this it did not state. On the court's own findings taxpayer owned only a half interest in Chateau. Therefore on the basis of receipt from Highland (rather than from Wilbur, a very considerable assumption[3]) or, more exactly, of constructive receipt, which, although not articulated, is the principle most favorable to its position, Greenspon v. Commissioner, 8 Cir., 1956, 229 F.2d 947, the court should have charged taxpayer with only one half of these payments. Cf. Shunk v. Commissioner, 6 Cir., 1949, 173 F.2d 747. Moreover, if the payments were loans, a matter we will consider later, the "benefit" to taxpayer was not even that. Wilbur's reversing the book entries of the payments made, and previously shown to have been made, to him to appear to charge them to taxpayer could not alter the plain facts, a ruling the court was quick to make with respect to other entries. The court did not, in fact, purport to rely on this reversal.

We revert to the payments made directly to taxpayer which went from it either to Chateau's suppliers or to Chateau. The burden of proving that these were loans to taxpayer is on taxpayer. Allen v. Commissioner, 1 Cir., 1941, 117 F.2d 364; Tate v. Commissioner, 8 Cir., 1938, 97 F.2d 658, cert. den. 305 U.S. 639, 59 S.Ct. 106, 83 L.Ed. 412;

2. The only basis under which it could be said that the beneficial ownership was in Highland would be to find that taxpayer was simply a conduit used by Wilbur for a misappropriation of Highland's money, and hence did not legally receive it. Cf. Newell v. Hadley, 1910, 206 Mass. 335, 92 N.E. 507, 29 L.R.A.,N.S., 908. The court did not so find, and it was not compelled so to find, particularly in view of the fact that taxpayer had already become a part owner of Chateau with what, unquestionably, was its own money. Furthermore, although in argument taxpayer spoke of itself as a conduit, the pleadings do not proceed on this basis, but allege that taxpayer received the funds from Highland as "loans" rather than alleging that it did not receive them at all.

3. Even a constructive dividend must be paid by and received from the declaring company, not from someone else with that other person's money. The court could rule that these payments were dividends to taxpayer only by finding that Wilbur did not own the funds Highland paid to him and charged to his account. It would seem inconsistent to say that Wilbur merely acted as Highland's agent to transfer its funds into Chateau, and at the same time say that taxpayer, in doing exactly the same thing, was not an agent, but acted on its own account.

cf. Hague Estate v. Commissioner, 2 Cir., 1943, 132 F.2d 775, cert. den. 318 U.S. 787, 63 S.Ct. 983, 87 L.Ed. 1154. We cannot say that the Court was plainly wrong. Significant to us is the fact that if these payments were loans taxpayer has not treated them as such in any substantial manner since they came to the knowledge of its remaining directors in 1953.[4] If taxpayer could show, which we do not think it has, that they were loans to be repaid only if the Chateau venture was successful, we would rule that such favorable, interest-free advances to a stockholder, for the benefit of the stockholder, cannot go tax-free. Cf. Trinchera Timber Co., 1928, 13 B.T.A. 934.

■ ■ Taxpayer calls attention to the fact that there was no right to pay dividends on Highland's Class B stock while the Class A was in arrears. There are two answers to this. In the first place, funds remained in Highland that were apparently ample to protect the interests of the Class A stockholders. More important, a number of courts have ruled that disproportionate payment of dividends does not alter the fact of their receipt. Spheeris v. Commissioner, 7 Cir., 1960, 284 F.2d 928, cert. den. 366 U.S. 944, 81 S.Ct. 1673, 6 L.Ed.2d 855; Roschuni v. Commissioner, 5 Cir., 1959, 271 F.2d 267, cert. den. 362 U.S. 988, 80 S.Ct. 1074, 4 L.Ed.2d 1021, aff'g E. J. Roschuni, 1958, 29 T.C. 1193; Lincoln National Bank v. Burnet, 1933, 61 App. D.C. 354, 63 F.2d 131. This seems to us correct as a matter of policy, at least after the "related" stockholders had passed their opportunity to disaffirm.

Indeed, even if it could be said that the other stockholders were defrauded, this does not mean that income was not realized. St. Regis Paper Co. v. Higgins, 2 Cir., 1946, 157 F.2d 884, cert. den. 330 U.S. 843, 67 S.Ct. 1083, 91 L.Ed. 1288; cf. James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246.

There remains the question of Highland's payments initially made to Wilbur rather than to taxpayer. Wilbur did not advance all of these directly to Chateau, but in some instances paid for labor and material furnished for its account. Even though, like many other matters, such payments do not appear on Chateau's books, we do not think that this meant that they were outright gifts to Chateau as distinguished from loans.[5] Looking at the substance of the transaction it seems fairly apparent (it is not possible to be certain about anything that was in Wilbur's mind) that Wilbur did not want one half of his advances to accrue to the permanent benefit of Chateau, and hence to taxpayer, particularly as this would mean that they could later be recovered from Chateau only by virtue of a taxable transaction. He would feel the same way about the other half if this was beneficially his rather than Miss Aarons'. Having in mind the tenuousness of Miss Aaron's interest in any event, we greatly doubt that he was making her a further gift. Accordingly, we conclude that Wilbur's advances to Chateau were intended as loans. As we have said previously, the court's treating these payments as dividends constructively received by taxpayer in their entirety was necessarily wrong. We con-

---

4. Alternatively, the surviving directors might have been able to take the position that, if dividends, they were unauthorized. Acting alone Wilbur was but a minority member of Highland's board of directors. In case of payments made to sole stockholders such formalities may be overlooked. Wilbur, however, was not the stockholder; taxpayer was. Wilbur was only a minority stockholder, as well as but a minority director, of taxpayer. It is difficult to see how he could lawfully, in any capacity, cause Highland to declare a dividend. However, here again, there

was a burden on the parties, upon learning of the circumstances, to take action. It is no answer that a number of these payments made to taxpayer were shown by Wilbur's later book entries, unsubstantiated in fact, to have been paid back.

5. The same question arises with respect to taxpayer. We can hardly believe that taxpayer was making outright gifts to Chateau. This would be a poor way to do business with even a partially-owned subsidiary.

clude it would be wrong even to split them fifty-fifty.

Judgment will be entered setting aside the decision of the Tax Court and remanding the action for the entry of a new decision consistent herewith.