Theodore O. Wentworth and Shirley Morse Wentworth v. Commissioner.
Wentworth v. Commissioner
Docket No. 2564-63.
United States Tax Court
T.C. Memo 1966-167; 1966 Tax Ct. Memo LEXIS 117; 25 T.C.M. (CCH) 869; T.C.M. (RIA) 66167; July 14, 1966
*117 Held: That net withdrawals of corporate funds by a corporation's president, charged to a withdrawal account, were intended as loans and therefore did not constitute taxable distributions of the corporation's funds to him. Paul W. Steer, 2215 Central Trust Tower, Cincinnati, Ohio, for the petitioners. W. Dean Short, for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: Respondent determined the following deficiencies in income taxes against the petitioners: 1957
$ 8,854.72
1958
7,205.06
1959
22,347.23
Petitioners conceded that they received dividend income in 1958 and 1959 in the respective *118 amounts of $3,261.05 and $3,552, as a result of personal usage of an airplane of Vulcan-Cincinnati, Inc. Respondent conceded that petitioners did not receive taxable income in 1959 for granting an option to Vulcan-Cincinnati, Inc., for the purchase of stock of Chemical Processes, Inc. The only issue remaining for decision is whether withdrawals by petitioner, Theodore O. Wentworth, from Vulcan-Cincinnati, Inc., during the years 1957, 1958, and 1959 constituted the receipt of taxable dividends under the provisions of sections 301 and 316 of the Internal Revenue Code of 1954, or whether the withdrawals constituted loans. Findings of Fact Some of the facts have been stipulated and are found accordingly and adopted as our findings. Petitioners are husband and wife and are residents of Cincinnati, Ohio. Their joint returns for the years involved were filed with the district director of internal revenue, Cincinnati, Ohio. Petitioner, Shirley Morse Wentworth, is a party herein only by reason of having filed a joint return with her husband, Theodore O. Wentworth, and the latter will hereinafter be referred to as the petitioner. During the years 1941 to April 1, 1964, petitioner *119 served as president of Vulcan-Cincinnati, Inc., an Ohio corporation. Vulcan-Cincinnati, Inc., operated under the name of Vulcan Copper and Supply Company during the period before March 7, 1956. This business was originally founded by petitioner's father as a partnership in 1901 and was incorporated at a later date. Petitioner started working for the corporation in 1930 or early 1931. He organized the engineering division for the corporation which grew into a functioning department at some time before 1950. Petitioner's father died on March 10, 1941, and petitioner and his brothers, Paul W. Wentworth and Elliot E. Wentworth (hereinafter sometimes referred to as Paul and Elliot), then took over control of Vulcan-Cincinnati, Inc., and managed it until April 1, 1964. Petitioner was personally involved in every phase of the business, and, as president, presided at meetings of the stockholders and the directors. Petitioner performed more services for Vulcan-Cincinnati, Inc., than the other officers, and he also received substantially larger salaries and bonuses than the other officers of the corporation. During the period July 1941 to April 1, 1964, petitioner withdrew certain monies *120 from Vulcan-Cincinnati, Inc. These withdrawals were recorded in an account entitled "Due From Officers - T. O. Wentworth." The year-end balances of the account for the years 1941 through 1964 are as follows: Year-End
Year
Balance
1941
$ 14,577.80
1942
15,921.00
1943
30,150.30
1944
32,193.26
1945
30,122.28
1946
31,106.49
1947
51,482.76
1948
51,803.80
1949
68,425.47
1950
80,921.24
1951
91,845.45
1952
104,270.42
1953
110,929.31
1954
111,184.27
1955
111,115.39
1956
108,335.21
1957
123,944.67
1958
131,995.84
1959
154,208.86
1960
157,623.37
1961
164,412.32
1962
194,584.74
1963
210,498.86
1964
108,712.15
The net amounts of petitioner's withdrawals from Vulcan-Cincinnati, Inc., at the end of the years 1957, 1958, and 1959 were $15,609.46, $8,051.17, and $22,213.02, respectively. Petitioner's withdrawals during the years in issue were principally for personal living expenses. Most of the withdrawals occurred in the form of cash advances or payment of personal items purchased through the company. Excluding transfers among accounts and accounting entries, most of the credit entries in petitioner's withdrawal account during *121 the litigated years pertain to payments by petitioner of specific bills soon after they had been charged to the account. Other credit entries, however, were larger in amount and resulted from payments made to petitioner by Vulcan-Cincinnati, Inc., for dividends, bonuses, confidential salary (salary other than regular salary which was received by all key employees), and the sale of stock and stock options, which were applied to the account at the time of receipt. In the three years here involved, credits in the total amounts following were made to the account: 1957
$26,049.75 [1]
1958
26,976.69 [1]
1959
13,746.88
No interest was ever paid on petitioner's withdrawals and no security was posted to insure repayment. No definite time was specified for repayment of withdrawals. Notes were not issued with respect to the years in issue. However, petitioner had executed six $15,000 notes on December 31, 1951, with one being payable on December 31 of each of the next six years. These notes were still outstanding during the years *122 in question and the balance due on the account exceeded the amount due on the notes at all times during those years. The withdrawal account has been treated as a receivable account and indebtedness of the petitioner on the records of Vulcan-Cincinnati, Inc., since the creation of the account. Petitioner also signed audit slips prepared for independent auditors for each of the years in question as confirmation of his indebtedness to the corporation in the amounts of the balances due on his withdrawal account. The withdrawals were recognized as loans by petitioner's brothers. Paul and Elliot were officers of Vulcan-Cincinnati, Inc., and substantial shareholders. They also withdrew certain funds from the corporation, and no interest was charged on these withdrawals. The amounts withdrawn by Paul and Elliot were always considered as loans, and partial repayments occurred periodically. The year-end balances in the withdrawal accounts of Paul and Elliot for the years 1941 through 1964 were as follows: Year-End Balances
Paul W.
Elliot E.
Years
Wentworth
Wentworth
1941
$ 2,429.05
$ 1,914.67
1942
8,639.59
1,902.03
1943
8,677.75
2,066.05
1944
0
5.76
1945
7,406.24
0
1946
0
22.14
1947
0
10,000.12
1948
87.44
14,509.55
1949
220.95
18,137.21
1950
364.56
17,942.58
1951
76.25
19,560.02
1952
41.47
18,362.56
1953
7.23
23,305.25
1954
959.18
26,309.71
1955
3,771.74
26,495.39
1956
4,355.18
4,398.10
1957
0
257.31
1958
45.43
0
1959
715.76
10.05
1960
5,885.42
84.09
1961
9,461.73
102.65
1962
4,072.12
12,528.26
1963
14,701.13
12,234.16
1964
9,074.34
26,412.59
*123 Employees other than corporate officers could borrow money from the corporation upon approval by the executive committee or officers of the corporation and no interest would be charged. No formal borrowing restrictions were placed on the corporate officers, but the loans would be discussed by the members of the board of directors. Withdrawals and the repayment of them were the subject of discussions between petitioner and his brothers. Although the brothers expressed dissatisfaction with the amount of petitioner's withdrawals, petitioner was never ordered to repay because Paul and Elliot were aware of petitioner's financial condition. Although the petitioner may not have been able to repay the balance of his withdrawal account out of his resources at any given time, his income would have permitted repayment within a reasonable period. Moreover, during the years in question, petitioner's financial interest in the business was worth more than his indebtedness to the corporation. The ownership of the outstanding shares of stock of Vulcan-Cincinnati, Inc., for the years ending December 31, 1956, through December 31, 1959, was as follows: Shareholders
12-31-56
12-31-57
12-31-58
12-31-59
Theodore O. Wentworth
530 1/2
405 1/2
310 1/2
310 1/2
Shirley M. Wentworth (Wife of T. O.)
150
150
150
150
Elise Wentworth Olds (Daughter of T. O.)
15
15
15
15
Prudence C. Wentworth (Daughter of T. O.)
15
15
15
15
Shirley E. Wentworth (Daughter of T. O.)
15
15
15
15
Linda E. W. LaBelle (Daughter of T. O.)
15
15
15
15
Paul W. Wentworth
713 1/2
672 1/2
642 1/2
622 1/2
Martha E. Wentworth (Former wife of Paul)
10
10
10
Jerry C. Wentworth (Present wife of Paul)
20
30
Paul Van Wentworth (Son of Paul)
4
35
45
55
Elliot E. Wentworth
515 1/2
390 1/2
390 1/2
360 1/2
Charlotte Ann Wentworth (Wife of Elliot)
165
165
165
165
David A. Wentworth (Son of Elliot)
15
Ann A. Wentworth (Daughter of Elliot)
15
Outstanding stock owned by other persons
52
52
52
52
Treasury Stock
1,109 1/2
1,359 1/2
1,454 1/2
1,454 1/2
TOTALS
3,300
3,300
3,300
3,300
*124 At all times pertinent, petitioner held valid and enforceable proxies, giving him voting and some ownership rights with respect to the stock titled in his wife's and daughters' names. The dividends declared and paid as shown by the records of Vulcan-Cincinnati, Inc., for the years 1950 through 1962 are as follows: Dividend Per
Total Divi-
Year
Share
dends
1950
$10.00
$28,600.00
1951
1.00
2,773.00
1952
1.00
2,773.00
1953
1.00
2,773.00
1954
1.00
2,773.00
1955
3.00
6,571.50
1956
5.00
10,952.50
1957
5.50
10,672.75
1958
5.50
10,150.25
1959
1.00
1,845.50
1960
1.00
1,845.50
1961
1.00
1,845.50
1962
1.00
1,845.50
The amounts of earned surplus available for distribution as dividends for each of the years 1956 through 1959 are as follows: Year
Earned Surplus
1956
$1,301,277.90
1957
1,454,683.98
1958
1,536,509.35
1959
1,210,444.46
During the years 1956 through 1961, it was necessary that Vulcan-Cincinnati, Inc., borrow funds for working capital. The corporation borrowed $250,000 from the Fifth Third Union Trust Company in 1956 at 5 percent interest and $585,000 in 1959 at 5 1/2 percent interest. Petitioner's *125 withdrawal account was represented to the bank as an indebtedness of petitioner to the corporation. In negotiating the bank loan, petitioner acknowledged to the loan officer that the withdrawal account was an indebtedness of his. Petitioner and his brothers were urged by the bank to make every effort to repay their loans to the corporation as soon as possible. Moreover, the 1959 loan agreement contained a provision limiting the amount of withdrawals by officers as a condition of making the loan. On October 31, 1963, a request for a ruling regarding a proposed divisive reorganization of Vulcan-Cincinnati, Inc., was sent to the Commissioner of Internal Revenue. The primary reason for the proposed corporate division was a disagreement between the brothers as to how funds of the corporation should be expended. The petitioner wanted to concentrate on research and development while Paul wanted to upgrade the production end of the business. The amounts considered to be due the corporation from the brothers were a contributing factor to the desire for a corporate division. The request for a ruling contained corporate financial statements which reflected the withdrawals in an asset account *126 titled "Due from Officers." Upon receipt of a favorable ruling, Vulcan-Cincinnati, Inc., was reorganized on April 1, 1964, into two corporations, Vulcan Manufacturing Company (hereinafter referred to as Manufacturing) and Vulcan-Cincinnati, Inc., (hereinafter referred to as Engineering). Petitioner and his immediate family became the owners of Engineering and Paul and Elliot and their families became the owners of Manufacturing. The asset account "Due from Officers" was divided between the new corporations in accordance with the new ownership rights. Therefore, the balance due on petitioner's withdrawal account became a receivable account of Engineering. Petitioner served as chairman of the board of directors of Engineering. On or about September 24, 1964, petitioner made a payment of $118,633.43 to Engineering in connection with his withdrawal account. This payment was made out of funds borrowed for such purpose at an interest rate of 4 percent. The payment occurred after receipt of the deficiency assessment involved in this case. Ultimate Findings of Facts At no time during the years in question did petitioner and his immediate family have sufficient stock interests in Vulcan-Cincinnati, *127 Inc., to allow the free exercise of dominion and control over corporate policies. It would have been detrimental to the financial interests of Paul and Elliot to allow petitioner to withdraw money from their jointly owned corporation with no intention of repaying. The net amounts withdrawn by petitioner from Vulcan-Cincinnati, Inc., during 1957, 1958, and 1959 were intended as and were in fact loans. Opinion Respondent contends that the net withdrawals from Vulcan-Cincinnati, Inc., charged to petitioner during the years in question were the equivalent of dividends and should therefore be taxed as dividend distributions under section 316, Internal Revenue Code of 1954. The petitioner contends that the net withdrawals were loans from the corporation and consequently were not taxable distributions. Whether withdrawals from a corporation represent loans or taxable distributions to a shareholder depends upon an analysis of all the facts and circumstances surrounding the subject transaction and the relationships between the stockholder, the corporation, and other stockholders. *128 Elliott J. Roschuni, 29 T.C. 1193 (1958), affd. per curiam 271 F. 2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960); Harry E. Wiese, 35 B.T.A. 701 (1937), affd. 93 F. 2d 921 (C.A. 8, 1938), certiorari denied 304 U.S. 562 (1938). There are numerous authorities to the effect that if a factual determination is made that it was the intention of the shareholder and the corporation at the time of the withdrawal to create a debtor-creditor relationship, then such withdrawals will not constitute taxable dividends. See Chism's Estate v. Commissioner, 322 F. 2d 956 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; William C. Baird, 25 T.C. 387 (1955); Carl L. White, 17 T.C. 1562 (1952). Petitioner's testimony that the withdrawals were intended as loans was convincing, and the occurrence of limited repayments is corroborating evidence that permanent retention of corporate funds was not planned. The fact that the overall balance due on petitioner's withdrawal *129 account was never reduced to zero by repayments during the existence of the account is not persuasive evidence of a contrary intent. During several of the years in which the account existed, petitioner actually repaid more than the amount withdrawn during the year. Respondent emphasizes the fact that the largest repayments were made from payments to petitioner by Vulcan-Cincinnati, Inc., for dividends, bonuses, confidential salary, and the sale of stock and stock options. These amounts were applied to the withdrawal account at the time of receipt. We draw no particular conclusions from this pattern of repayments. It only seems to indicate that petitioner borrowed money for current expenses in anticipation of repaying from future income. Vulcan-Cincinnati, Inc., was petitioner's primary source of income and application of a portion of the income received from the corporation to the withdrawal account would be expected in such a situation. Although the total amount due on the withdrawal account gradually increased to a substantial sum, the net withdrawals for any given year were not so excessive as to require a conclusion that such amounts were patently not loans. Petitioner was *130 compensated for his corporate duties at a level which would have allowed total repayment of the account's balance within a reasonable time if the practice of withdrawing additional funds was terminated. Petitioner's testimony that the withdrawal account was a loan account was supported by his brothers. Paul testified at trial that withdrawals from the corporation by the brothers had always been considered as bona fide loans, and that they had always acknowledged this fact to each other. The testimony of persons related to a taxpayer by blood or marriage is not usually given special weight due to possible sympathy with the taxpayer and consequential partiality. Here, however, petitioner's brothers and their immediate families constituted the majority shareholders of the corporation. Their understanding that petitioner's withdrawal account was a loan is consistent with their financial self-interests in the conservation of corporate funds. We do not believe that Paul and Elliot would have consciously allowed petitioner the unequal benefit of unlimited withdrawals for personal purposes with no *131 obligation of repayment. It was apparently recognized that petitioner performed more valuable services for the corporation and petitioner was compensated accordingly with the result that he received more compensation than the other brothers who were also employed by Vulcan-Cincinnati, Inc. It seems doubtful that the brothers would knowingly acquiesce in a plan whereby disguised compensation was received by petitioner when petitioner's higher level of compensation was already commensurate with the proportionately greater services rendered by him to Vulcan-Cincinnati, Inc. The preceding conclusion is supported by petitioner's lack of dominion and control over corporate policies. When withdrawals are challenged as dividend distributions, the question of whether the taxpayer has effective control of the corporation becomes important. Special scrutiny should be given to a situation in which the withdrawer is in substantial control of the involved corporation. See W. T. Wilson, 10 T.C. 251 (1948), affd. 170 F. 2d 423 (C.A. 9, 1948), certiorari denied 336 U.S. 909 (1949); *132 Ben R. Meyer, 45 B.T.A. 228 (1941). In the instant case, petitioner and his immediate family did not have a controlling stock interest in the corporation. Moreover, petitioner's brothers were active in conducting corporate affairs and it could not be found that petitioner exercised a dominating influence over the policies of Vulcan-Cincinnati, Inc. The financial interests of Paul and Elliot would have been adversely affected by petitioner's alleged plan to use corporate funds for himself with no intention of making reimbursements. Petitioner was not in a position of control whereby such a plan could have been exercised solely at his discretion, and the consent of the brothers, tacit or otherwise, would have been necessary. We believe that the requisite consent would not have been granted due to the adverse effect of such a plan on the financial interests of Paul and Elliot. While it is true that no formal action was ever taken by Vulcan-Cincinnati, Inc., to obtain complete repayment of petitioner's withdrawals, this inaction is understandable under the circumstances. Petitioner was instrumental to the continuing sucess of the corporation and his alienation would not *133 have been beneficial to Vulcan-Cincinnati, Inc. Paul and Elliot were aware of petitioner's personal financial problems and evidently agreed that enforced repayment was not the solution so long as petitioner agreed to make repayments and treated the account as a debt. We are not concerned with whether this was a wise corporate policy, especially when the corporation itself was in need of working capital. We are only concerned with whether loans were in fact intended and so recognized by those persons involved. Moreover, the fact that petitioner may have been a bad risk as a borrower is of little consequence. The policy of allowing petitioner to make further withdrawals may have been a poor one, but this does not preclude the presence of loans. We believe that lack of enforcement of the debt obligation is not inconsistent with the existence of bona fide loans under the particular facts of this case. The petitioner's testimony that the withdrawals constituted loans is further supported by certain objective evidence. Dividends were declared and paid to the stockholders for the years 1950 through 1962. The withdrawal account was treated as an account receivable on the books and financial *134 statements of Vulcan-Cincinnati, Inc. It is well settled that book entries may not be used to conceal realties as a means of relieving the taxpayer from liability for income taxes. Ben R. Meyer, supra, and cases cited therein. The book entries nevertheless constitute documentary evidence of a loan, and, although not conclusive of the issue, they must be considered. The weight to be given to such evidence will depend upon the surrounding circumstances. Additional evidence was presented on behalf of petitioner. The request for a ruling on the proposed reorganization of Vulcan-Cincinnati, Inc., classified the withdrawals as debt. The audit slips for the years in question signed by petitioner as confirmation of his indebtedness to the corporation in the amount of the withdrawal account's balance are objective manifestations of the alleged intent to borrow. The treatment of the withdrawal account by the bank in connection with corporate loans is particularly significant. Petitioner acknowledged to the bank's loan officer that the withdrawal account was an indebtedness. Petitioner *135 was admonished by the loan officer about the excessive withdrawals, and he was urged to make every effort to repay his personal debt to the corporation. The 1959 bank loan to Vulcan-Cincinnati, Inc., contained a provision limiting the amount of withdrawals by officers as a condition of making the loan. The foregoing factors relating to the bank loan are strong indicia of the existence of a loan relationship between the corporation and petitioner. Respondent emphasizes the lack of notes issued with respect to withdrawals during the years in question, the indefinite time for repayment, the failure to post security to insure repayment, and the absence of interest charges. While these factors must be considered, a thorough consideration of their relative importance to the overall picture has left us unconvinced as to their persuasive merit in the total factual picture presented by the record here. Petitioner has always used his withdrawal account like a credit card for personal living expenses. There is no evidence indicating that the nature of the withdrawals ever changed during the existence of the account. The issuance of notes in nearly the amount of the withdrawal account's year-end *136 balance in 1951 is indicative of petitioner's acknowledgment that withdrawals prior to the issuance of the notes on December 31, 1951, constituted debt. We are convinced from the evidence of record that petitioner's intent with respect to withdrawals after 1951 did not change and that the notes issued in 1951 constitute relevant evidence of a documentary nature tending to prove that the withdrawals were always considered debt obligations. The presence or absence of notes, however, is not controlling. Withdrawals have been held dividends in both situations. This observation is also true with respect to interest charges and posting of security. In Harry E. Wiese, supra, at 704, the following statement is made: It is obvious that a withdrawal by a stockholder of funds of a corporation does not necessarily constitute a distribution of profits, even if the corporation has an accumulation of profits in excess of the withdrawal; and such withdrawal may or may not, in the light of that fact alone, be said to be a dividend. A corporation may lend its funds, including earnings, with *137 or without interest, on open account or upon notes, secured or unsecured; and such privilege is not restricted to the lending of its funds to persons other than stockholders. Therefore, whether the withdrawals of corporate funds by petitioner, here in controversy, constituted loans or dividends in the years when withdrawn must be determined from the facts in the record before us; * * * Petitioner points to the fact that he paid no interest on the amounts withdrawn, nor was any charged, and that he executed no notes or other evidences of indebtedness to the corporation. But these facts are not necessarily controlling. The withdrawals may still have been bona fide loans. That there was no definite time for repayment of withdrawals is entirely consistent with the existence of debts incurred in an informal manner. Petitioner did not always make direct withdrawals of corporate funds. The amount of the withdrawals depended upon the amount of the various personal expense items charged to the account. It seems apparent from the evidence of record that we are not concerned here with a conscious plan to siphon off corporate funds in definite amounts determined prior to the withdrawals. *138 The existence of such a plan is further controverted by the fact that withdrawals from Vulcan-Cincinnati, Inc., by the stockholders were not in proportion to their stockholdings in the company. This factor is not determinative of whether withdrawals constitute loans or dividends. Ben R. Meyer, supra, at 241, and cases cited therein. Nevertheless, the existence of loans is certainly supported by the occurrence of substantially disproportionate withdrawals by a minority stockholder who does not control corporate policies. Petitioner attempts to substantiate the existence of loans by introducing evidence of his large payment to Engineering in 1964 which was applied to the balance due on the withdrawal account acquired by Engineering upon the reorganization of Vulcan-Cincinnati, Inc. We have accorded little weight to this evidence because the payment occurred after receipt of the deficiency assessment involved in this case and it was made out of funds borrowed for such purpose. Moreover, the payment was made to Engineering which is a corporation owned and controlled solely by petitioner and his immediate family. Viewing the totality of the circumstances as established *139 by the evidence of record and giving proper weight to the many factors reflecting on the question of intent, it is our considered judgment and we have so found as an ultimate fact that the net amounts withdrawn by petitioner from Vulcan-Cincinnati, Inc., during 1957, 1958, and 1959 were intended as loans. The petitioner has sustained his burden of overcoming the presumption of correctness which was afforded respondent's deficiency determination with respect to the withdrawals. We hold that the net withdrawals in controversy did not constitute taxable distributions of corporate funds. A Rule 50 computation is necessary because of certain concessions by both parties. Decision will be entered under Rule 50. Footnotes
1. These figures do not reflect credit entries in the total amounts of $41,500 in 1957 and $7,000 in 1958, which were subsequently reversed.↩