Ralph D. CROWLEY and Frances A.
Crowley, Petitioners, Appellants,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent,
Appellee.

No. 91–1613.

United States Court of Appeals,
First Circuit.

Heard Dec. 2, 1991.

Decided April 28, 1992.

James C. Donnelly, Jr. with whom Joan
O. Vorster and Mirick, O'Connell, DeMallie
& Lougee, Worcester, Mass., were on brief,
for petitioners, appellants.

Janet A. Bradley with whom Gary R.
Allen, Chief, Appellate Section Tax Div.
and David I. Pincus, Tax Div., Washington,
D.C., were on brief, for respondent, appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

The Internal Revenue Service ("IRS") assessed a $206,935 deficiency against appellants Ralph and Frances Crowley based on their failure to declare, as taxable income in 1982, $443,769 in discretionary withdrawals by Ralph Crowley from Polar Corporation ("Polar"), a closely-held corporation of which Ralph and his three brothers were the only individual shareholders. The IRS determined that the alleged loans were taxable as "constructive dividends." The Tax Court upheld the deficiency assessment against appellants. We affirm.

## I

### FACTS [1]

In 1982, the four Crowley brothers [2] each held 20.43% of Polar's capital stock. The remaining 18.23% was held by the Polar Employee Profit Sharing Plan ("Polar Plan"). Appellant Ralph Crowley was Chairman of the Board of Directors, as well as an employee of Polar. The other Crowley brothers were corporate officers.

For many years, the Crowley brothers each maintained an "Officer Loan" account at Polar, which reflected their discretionary withdrawals of corporate funds for their own use. Each brother was permitted to withdraw whatever amount he deemed appropriate, without prior authorization from one another or anyone else. The amounts outstanding in each brother's account were reflected on Polar's certified financial statements as accounts receivable from corporate officers (current assets) and on Polar's federal income tax returns as loans

---

1. The recited facts are not in dispute. For ease in reference, we discuss appellants' joint appeal as if Ralph Crowley were the only appellant.

2. The other Crowley brothers are Denis, Edward, and James.

to stockholders. The Crowley brothers executed no promissory notes, pledged no collateral, and undertook no loan repayment terms or interest obligations, though each brother annually submitted a confirmation letter to Polar's auditors, reflecting the amount "due" or "payable" to Polar. Throughout the period in question, Polar declared no dividends.

The exceptionally large amount of the Polar withdrawals made by Ralph Crowley in 1982, totalling $443,769, was used to fund an unsecured loan to a company which was developing a commercial ski area at Wachusett Mountain ("Wachusett"). During 1983, Denis Crowley, a Polar Plan trustee, expressed concern about Ralph Crowley's large withdrawals from Polar during 1982 and recommended that Ralph's withdrawal privileges be suspended. Although the Polar Board of Directors, comprised of the Crowley brothers, for the first time imposed interest charges on "officer loans" in 1983, Ralph Crowley's withdrawal privileges were unaffected. Ralph's account balance peaked at $590,083.57 in 1983, but declined during each succeeding year.[3] During 1988, the year in which IRS assessed the challenged 1982 tax deficiency, Ralph and Denis Crowley acquired all the Polar shares held by their brothers.

## II

## DISCUSSION

### A. *Loan or Constructive Dividend*

■ A shareholder distribution is a loan, rather than a constructive dividend, if *at the time of its disbursement* the parties intended that it be repaid. *Alterman Foods, Inc. v. United States*, 611 F.2d 866, 869 (Ct.Cl.1979) [hereinafter *Alterman Foods II*]; *M.J. Byorick, Inc. v. Commissioner*, 55 T.C.M. (CCH) 1037, 1047 (1988); *Paul W. Thielking, O.D., P.C. v. Commissioner*, 53 T.C.M. (CCH) 746, 749 (1987); *Miele v. Commissioner*, 56 T.C. 556, 567 (1971), *aff'd mem.*, 474 F.2d 1338 (3d Cir.),

*cert. denied*, 414 U.S. 982, 94 S.Ct. 279, 38 L.Ed.2d 225 (1973). Courts typically determine whether the requisite intent to repay was present by examining available objective evidence of the parties' intentions, including the degree of corporate control enjoyed by the taxpayer; the corporate earnings and dividend history; the use of customary loan documentation, such as promissory notes, security agreements or mortgages; the creation of legal obligations attendant to customary lending transactions, such as payment of interest, repayment schedules and maturity dates; the manner of treatment accorded the disbursements, as reflected in corporate records and financial statements; the existence of restrictions on the amounts of the disbursements; the magnitude of the disbursements; the ability of the shareholder to repay; whether the corporation undertook to enforce repayment; the repayment history; and the taxpayer's disposition of the corporate funds disbursed. *See, e.g., Busch v. Commissioner*, 728 F.2d 945, 948 (7th Cir.1984); *Alterman Foods II*, 611 F.2d at 869; *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 877 n. 7 (5th Cir. 1974) [hereinafter *Alterman Foods I*]. The constructive dividend inquiry concerns itself with the parties' subjective intent, rather than objective intent, although recourse to objective evidence is required to ferret out and corroborate actual intent. *Busch*, 728 F.2d at 949 (the parties' intent is not determined on the basis of a legal presumption formed from the objective evidence); *M.J. Byorick, Inc.*, 55 T.C.M. (CCH) at 1047 (court inquires into subjective intent, as borne out by objective factors); *Faist v. Commissioner*, 40 T.C.M. (CCH) 1128, 1132 (1980) (same); *Pizzarelli v. Commissioner*, 40 T.C.M. (CCH) 156, 159 (1980) (same); *Koufman v. Commissioner*, 35 T.C.M. (CCH) 1509, 1523 (1976) (objective indicia provide "helpful guideposts" en route to determination "whether repayment was actually intended.").

---

**3.** At trial, Ralph testified that there was never any question that he had an obligation to repay Polar and that he always believed he would be able to do so. Ralph's testimony was supported by Denis and Edward Crowley, and by two partners from Polar's accounting firm.

■ The determination whether the parties to the transaction actually intended a loan or a dividend presents an issue of fact. *Jaques v. Commissioner*, 935 F.2d 104, 106–07 (6th Cir.1991); *Tollefsen v. Commissioner*, 431 F.2d 511, 513 (2d Cir.1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971). *See Ogden Co. v. Commissioner*, 412 F.2d 223, 225 (1st Cir. 1969) ("clearly erroneous" standard). *Cf. Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 152 (1st Cir.1990) ("Findings concerning an actor's intent fit neatly within the integument of the 'clearly erroneous' rule.").

### B. *Standard of Review*

■ We review the Tax Court's ultimate "constructive dividend" finding for "clear error," *Ogden*, 412 F.2d at 225, like any other fact found by the Tax Court, I.R.C., § 7482(a); Fed.R.Civ.P. 52(a); *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1200, 4 L.Ed.2d 1218 (1960); *Manzoli v. Commissioner*, 904 F.2d 101, 103 (1st Cir.1990). A finding of fact is not clearly erroneous unless " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct.· 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *Lundquist v. Precision Valley Aviation, Inc.*, 946 F.2d 8, 11 (1st Cir.1991) (per curiam).

■ "Where there are two permissible views of the evidence, the factfinder's choice between them *cannot be clearly erroneous.*" *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511 (emphasis added); *Rodriguez–Morales v. Veterans Admin.*, 931 F.2d 980, 982 (1st Cir.1991). The inferences drawn from undisputed facts are entitled to the same deferential standard of review, *Duberstein*, 363 U.S. at 291, 80 S.Ct. at 1200; *Anderson v. Beatrice Foods Co.*, 900 F.2d 388, 392 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 233, 112 L.Ed.2d 193 (1990), as are all credibility determinations undergirding the ultimate finding of fact, *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir.1991) (citing cases). The determination whether to credit the testimony of the taxpayer as to his actual intent requires just such a finding, which may be set aside only if clearly erroneous.[4]

### C. *Subsidiary Findings*

■ The ultimate Tax Court finding that appellant's withdrawals were constructive dividends was based principally on seven subsidiary findings.[5] Weighing all the evi-

---

4. Since Ralph, Denis and Edward Crowley testified before the Tax Court, deferential "clear error" review is especially appropriate, as the court's credibility determinations comprise a prime element in the Tax Court's "constructive dividend" determination. *DesRosiers*, 949 F.2d at 19 (deference is particularly appropriate where credibility determinations are pivotal); *Cumpiano*, 902 F.2d at 158–59 (whether to accept testimony as to knowledge and intent is predominantly a credibility determination).

Appellant frivolously asserts that the Tax Court decision represents "a factually unprecedented application of law...." As the Tax Court was required by law to determine the *subjective* intent of the parties, it is neither significant nor surprising that its "application of law" in this case be viewed as "factually unprecedented." *See, e.g., Jaques*, 935 F.2d at 109 (constructive dividend cases are "unique on their facts"); *Busch*, 728 F.2d at 951 (each case "turns on its own particular facts"). Moreover, contrary to appellant's assertion, this is not the only case in which a withdrawal was determined a "constructive dividend" despite the fact

that "the taxpayer did not have at least de facto control of the company." *See Regensburg v. Commissioner*, 144 F.2d 41 (2d Cir.), *cert. denied*, 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625 (1944).

5. These subsidiary findings may be paraphrased as follows:

1) As one of four *family member* shareholders who established the tacit corporate policy permitting any Crowley brother to withdraw Polar funds for personal use, Ralph Crowley alone "made the decisions as to the timing, amount, and use of the funds he withdrew....";

2) The informality surrounding Ralph's withdrawals exceeded that normally attending loans of such size: no notes, no maturity dates or events of default, no security and no limit on withdrawals;

3) Subsequent credits to Ralph's "loan" account were not bona fide repayments;

4) Polar's belated decision to charge interest on future withdrawals is suspect since the decision was made only after the IRS began its audit of Polar on January 26, 1982;

dence, the Tax Court held that appellant had not met the burden of proving that the parties intended that his Polar fund withdrawals in 1982 were to be repaid. *See* Rule 142(a), Rules of Practice and Procedure of the United States Tax Court (petitioner bears burden of proof); *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Whitcomb v. Commissioner*, 733 F.2d 191, 194 (1st Cir.1984). Following an exhaustive review, we conclude that the ultimate "constructive dividend" determination must be affirmed.

### 1. Unrestricted Withdrawal Privilege

Although appellant concedes that he enjoyed the privilege of withdrawing Polar funds without prior approval from anyone, he contends that significant restraints resulted from his limited control of Polar's corporate affairs, since he was not a majority shareholder. Not only was appellant the Chairman of the Board of Directors, however, but the record deprives his contention of any significance, since the alleged constraints on appellant's withdrawal privileges in no sense inhibited his disproportionately large withdrawals, leaving him free to withdraw far more funds in 1982 than the aggregate amount withdrawn by the three brothers who held majority control.

Appellant emphasizes in particular the reactions by Denis and Edward Crowley, during 1983, to appellant's extraordinarily large withdrawals in 1982, as well as his "repayments" on his Polar account balance beginning in late 1983. Appellant argues that this evidence demonstrated a lack of unfettered control over withdrawals and that the practice of allowing withdrawals without prior approval was subject to the understanding that all withdrawals were to be repaid.

The other side of the evidentiary ledger indicates that appellant's withdrawal privileges were never challenged until 1983. Moreover, even after Denis Crowley attempted to curb appellant's privileges in 1983, appellant's withdrawal privileges remained unrestricted. Whether Polar's failure to curb appellant's withdrawal privileges, despite the alleged consternation among the majority shareholders, was due to the inability or the unwillingness of the other Crowleys to do so is unimportant. The reality is that no controls were imposed on appellant's withdrawal privileges. Together with other evidence, the absence of actual restraints on appellant's withdrawal privileges, both before and after the extraordinarily large withdrawals in 1982, permitted the Tax Court reasonably to infer that the withdrawals in 1982 were not bona fide loans. Although appellant, and others, testified that the privilege to withdraw corporate funds without prior approval was founded on a mutual understanding that repayment was expected, the credibility determination was for the Tax Court. *See DesRosiers*, 949 F.2d at 19.

Moreover, appellant incorrectly assumes that, if credited, the concerns evidenced by his brothers, when they learned of the grossly disproportionate withdrawals he had made in 1982 could only indicate that they had always intended that their withdrawals be repaid. No such inference was

5) Although Ralph asserted the intention to repay Polar with cash generated from the Wachusett ski area development, Wachusett was not generating a net cash flow, nor did Ralph ever obligate himself to commit any monies disbursed by Wachusett toward the repayment of his Polar account;
6) Ralph's claim that he could have surrendered his Polar stock to repay the Polar withdrawals was not entitled to full credit;
7) The Polar withdrawal policy and the Crowleys' practice was prompted by Small Business Administration ("SBA") restrictions on salary and dividend disbursements to Polar shareholders. [Findings 2) and 6) are merged for discussion purposes below.]

The Tax Court made countervailing findings as well. It found that the substantial disproportion among the Crowleys' withdrawal account balances, notwithstanding their identical shareholdings, represented some evidence that loans were intended. The Tax Court noted also that Polar's accounting records treated the withdrawals as loans, which constituted additional nondispositive evidence in support of appellant's contention. *But see, e.g., Williams v. Commissioner*, 37 T.C.M. (CCH) 1270, 1277 (1978), *aff'd*, 627 F.2d 1032 (10th Cir.1980) (book entries and records not determinative and may not be used to conceal economic reality);

required. On the contrary, their concerns may have been prompted instead simply by Ralph's withdrawal of far *more than his proportionate share* and by their disquietude about the practical difficulties involved in redressing the disparity. Thus, the record does not require an inference, as appellant would have it, that the other brothers' concerns were based on their desire to ensure compliance with a longstanding agreement that withdrawals were to be repaid, but only that Ralph's withdrawals in 1982 were egregiously disproportionate to his shareholdings. The latter inference would provide strong support, of course, for the Tax Court ruling that the withdrawals in 1982 were intended as dividends.

### 2. Documentary Evidence

Appellant argues that the Tax Court elevated form above substance by overemphasizing the absence of customary documentary evidence that the shareholder withdrawals were bona fide loan transactions, such as promissory notes requiring repayment of the principal within a prescribed term, or security agreements and mortgages.[6] As appellant points out, form may not prevail over substance, *see, e.g., Meyer v. Commissioner*, 45 B.T.A. 228 (1941), yet form, as is its legitimate purpose, may provide reliable insights to substance, particularly in commercial transactions.

■ Although customary loan documentation is not a prerequisite to a bona fide loan, *see, e.g., Wentworth v. Commissioner*, 25 T.C.M. (CCH) 869, 874 (1966), its absence unquestionably is relevant to the

parties' intent. The Tax Court correctly ascribed no conclusive weight to its subsidiary finding on the absence of objective documentary evidence. *See, e.g., Alterman Foods II*, 611 F.2d at 869 (no single factor is determinative). Thus, the absence of loan documentation merely left appellant with one less string to strum for the factfinder. *See Lewis v. Commissioner*, 50 T.C.M. (CCH) 1414, 1417 (1985) (informality relating to large withdrawals went beyond what would be expected, even for a closely-held corporation).

Appellant argues that his Polar shareholdings were available as informal collateral to secure repayment of the withdrawals, since a shareholder agreement prohibited stock transfers without the approval of other Polar shareholders. Although the other Crowley brothers may have felt that Ralph's Polar shares were tantamount to informal collateral, the Tax Court supportably found that any such informal provision of security would have brought appellant's true intentions as to the disposition of his Polar shares into serious question: "petitioner was required to withdraw funds from Polar to finance the ... ski project, and it was his ownership of the Polar stock which enabled him to withdraw corporate funds."[7] Thus, the Tax Court permissibly inferred that it would be unrealistic in the circumstances to assume that appellant intended to relinquish his Polar stock while it was still laying golden eggs. Furthermore, and more importantly, by 1983 the other Crowley brothers may have become more concerned about Ralph's intentions, or ability, to rectify the imbalance brought about

---

*Baird v. Commissioner*, 25 T.C. 387, 395 (1955) (same).

6. Appellant argues that the confirmation letters he and his brothers signed at the end of each year evidence that their acknowledged withdrawals were demand obligations. The Tax Court recognized that "transactions of closely held corporations are frequently characterized by informality, [but that] the informality relating to the payments in question [$443,000] goes beyond what we would expect with respect to purported loans of this size. The advances were not evidenced by notes. There was no set maturity date or event of default which would require petitioner to remit the funds at a certain time."

7. Appellant points also to Edward Crowley's memorandum of April 6, 1983, which states that appellant's loan account balance was covered by his equity interest in the corporation. Denis Crowley seems not to have been as confident, however. In his memorandum of March 28, 1983, Denis recommended that "collateral, in the form of Polar Corporation stock or other unencumbered assets ... be immediately assigned to the Company as security for [appellant's] loan." On July 22, 1983, however, the Board of Directors voted (3 to 1) not to curb Ralph's withdrawal privileges and not to require Ralph "to pledge to the Corporation unencumbered securities in an amount sufficient to secure his outstanding indebtedness to the Corporation."

by Ralph's unexpectedly disproportionate withdrawals in 1982.[8]

■ In any event, the Tax Court was not required to credit the Crowleys' stated intentions in 1983 as controlling evidence of their pre-audit intentions or of their intentions at the time appellant *withdrew* the funds in 1982. Rather, as previously suggested, the concerns of the other Crowley brothers in 1983 may as reasonably have been attributable to the *disproportionately* large withdrawals Ralph made during 1982. The Tax Court was not required to infer that their concerns related to any *preexisting* understanding that withdrawals were to be repaid. Instead, since Ralph's large withdrawals during 1982 were grossly disproportionate not only to his brothers' cumulative withdrawals but to his own stock holdings in Polar, their concerns may as well have been caused by their lack of confidence that Ralph's Polar stock could cover the disproportionately large "constructive dividends" disbursed in 1982.[9] Indeed, if the preexisting mutual intentions of the Crowley brothers (hence, Polar) were that their withdrawals were never meant to be repaid, but rather, as the Tax Court found, were constructive dividends, the concerns of the other three Crowley brothers would be nonetheless reasonably explainable as having been based simply on their misgivings as to how the imbalance in "constructive dividend" disbursements made to Ralph during 1982 might be rectified in the future.

### 3. Putative Repayments

The Tax Court concluded that appellant's putative loan repayments were not bona fide. First, the court supportably found that since appellant was allowed to withdraw Polar funds without restriction, he was in a position to fund the putative repayments by withdrawing larger amounts than he needed at the time for other purposes, using the excess to fund the "repayments." Second, much of the "loan" reduction was accomplished by artificially crediting his Polar bonuses to his "loan" account.

Appellant argues that the stipulated account balances demonstrate that his "repayments" between 1984 and 1988 greatly exceeded withdrawals. Thus, he insists, these "repayments," at least, were "real." Moreover, ultimately all of the appellant's withdrawals were "repaid" in full, with interest. Notwithstanding the correctness of appellant's description of the record evidence, the proposed inferences are not required.

■ Repayment is strong evidence that an advance was intended as a loan. *See, e.g., M.J. Byorick, Inc.,* 55 T.C.M. (CCH) at 1047. But as the Third Circuit pointed out some time ago, to characterize a transfer of funds as a "repayment" begs the question; it is not a "repayment" unless there was an intent to repay *at the time the advance was made. Estate of Taschler v. United States,* 440 F.2d 72, 75 (3rd Cir.

**8.** The Tax Court did not err in its implicit determination that appellant's reliance on "informal collateral," or on Edward's memorandum, lacked the probative value provided by customary loan terms and documentation. For one thing, on their face the latter evince the assumption of legally enforceable obligations on the part of the putative borrower. Clearly, duly executed loan documents normally go a very long way toward establishing the intent of the parties, since it is not to be presumed that a party to a transaction not intended as a loan would invite an enforced repayment by executing a written promise to do so. Nevertheless, ultimately controlling the constructive dividend analysis is the intent to obligate oneself, not merely the formal indicia. *See Estate of Chism v. Commissioner,* 322 F.2d 956, 960 (9th Cir. 1963).

**9.** A constructive dividend may be found even though disbursements are disproportionate to shareholdings. *See, e.g., General Aggregates Corp. v. Commissioner,* 313 F.2d 25, 28 (1st Cir.), cert. denied, 375 U.S. 815, 84 S.Ct. 47, 11 L.Ed.2d 50 (1963); *Paul W. Thielking, O.D., P.C.,* 53 T.C.M. (CCH) at 751; *Roschuni v. Commissioner,* 29 T.C. 1193, 1204 (1958), aff'd, 271 F.2d 267 (5th Cir.1959), cert. denied, 362 U.S. 988, 80 S.Ct. 1074, 4 L.Ed.2d 1021 (1960); *Meyer,* 45 B.T.A. at 241; *see also Regensburg,* 144 F.2d at 44. Of course, disproportionate disbursements among shareholders is relevant, though not controlling, evidence that the benefit was not meant to be retained permanently, hence that a loan was intended. *See, e.g., Wentworth,* 25 T.C.M. (CCH) at 874–75. The individual account balances during pre-audit and post-audit years varied dramatically.

1971). The Tax Court accordingly recognized that little weight need be given appellant's "repayments" *after* 1982 as evidence of the parties' intentions *during* 1982 when appellant made the withdrawals which were the basis for the deficiency assessment. Thus, the court supportably found that appellant's unrestricted withdrawal privileges, liberally enjoyed in effecting the extraordinarily large withdrawals in 1982, deprived the putative "repayments" in subsequent years of much of their probative value as evidence of the parties' intentions at the time the withdrawals were made.

Second, regarding the year-end bonuses credited to appellant's account, the Tax Court correctly observed that appellant "in essence withdrew sums, charged them to his loan account, and then reduced the 'loan' by crediting the account with his bonus." Appellant mischaracterizes the Tax Court statement as incorporating an erroneous assumption that he could award himself discretionary bonuses. On the contrary, the court merely pointed out that the manner in which appellant credited his year-end bonuses effected *no net reduction* in the "loan" account. Rather, these transactions amounted to a "wash." The same result would have been achieved if he had pocketed the year-end bonus directly, instead of making a withdrawal and then offsetting it by applying the bonus to the withdrawal account.

### 4. Interest Payments

The Tax Court recognized that appellant's interest payments were relevant evidence of intent to repay, but found their probative value significantly reduced since Polar did not charge interest until 1983, after the IRS began its tax audit of Polar. Thus, like other post-disbursement circumstantial evidence, the court was not required to infer that the post–1982 interest payments were determinative of the parties' intentions at the time of the withdrawals.

Appellant attempts to escape the force of the Tax Court finding by contending that the evidence established that Polar began charging interest in 1983 due to Denis

Crowley's concerns of fairness to other stockholders, including the Polar Plan. Although the proposed inference is plausible, the countervailing inference drawn by the Tax Court is no less so. *See, e.g., Busch,* 728 F.2d at 950 (taxpayer's actions after being contacted for an audit are not conclusive as to *pre*-audit intent). Hence, the Tax Court inference cannot have been clearly erroneous. *See Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511; *DesRosiers,* 949 F.2d at 19.

### 5. Wachusett Cash Flow

The Tax Court rejected the contention that appellant intended to repay Polar with cash flowing from the Wachusett ski project. The court supportably found that (i) Wachusett was experiencing serious cash-flow problems, which was the reason appellant required the large sums he withdrew from Polar in 1982; and (ii) appellant never committed himself, "by way of mortgage or otherwise," to repay Polar with any monies received from Wachusett. Moreover, our review reveals that appellant never remitted to Polar any of the monies Wachusett disbursed to him in 1983. *Cf. Williams,* 37 T.C.M. (CCH) at 1277 (noting significance of fact that petitioners used withdrawals to purchase an asset subsequently sold at a profit without remitting any sale proceeds to corporation); *Baird v. Commissioner,* 25 T.C. 387, 395 (1955) (same).

### 6. Motive

The final subsidiary finding by the Tax Court provides sturdy support for the inference that all the Crowley brothers, as the only voting stockholders, shared a common motive for nurturing the Polar withdrawal policy:

> [W]e consider it relevant that pursuant to the terms of its Small Business Administration loan, Polar was prohibited from paying salaries in excess of $15,000 per year or any dividends. Because of these restrictions, Polar's shareholders were required to "borrow" funds from Polar in lieu of receiving dividends or increased salaries. Thus, Polar was

forced to couch the distributions to petitioners as loans.

Appellant argues that these SBA restrictions were no longer in force during 1982. The record demonstrates, however, that appellant misapprehends some of the evidence and attempts to displace the Tax Court finding by drawing more favorable inferences than the court considered warranted.

First, the SBA loan agreement proscribed Polar dividends before, during, and after 1982. Thus, the Tax Court's fundamental finding of fact was in no sense erroneous. Second, the inference drawn from its fundamental finding was eminently reasonable: the Polar shareholder withdrawal policy enabled SBA-proscribed salary increases or dividends to be disbursed to the Crowleys in the guise of loans. *See also Meyer*, 45 B.T.A. at 239 (noting corporation had never declared dividends, and noting advantages gained by disbursing "loans" instead of dividends); *supra* at pp. 1079–80 (earnings and dividend history to be considered in constructive dividend cases).

On the other hand, the record indicates that contrary to its practice in previous years the SBA did not enforce its cap on Polar shareholder salaries during 1982, and that the Crowleys received salaries substantially above $15,000 that year. Although the SBA *salary* cap did not continue in force during 1982, it was not unreasonable to infer that the SBA restriction on shareholder salaries and dividends provided a substantial stimulus for the Polar withdrawal policy prior to 1982.[10] Since the parties' actual intentions at the time of appellant's withdrawals in 1982 remains the central focus of the "constructive dividend" determination, nonenforcement of the SBA *salary* cap in 1982 did not preclude the Tax Court inference that appellant did not intend to repay the withdraw-

als made in 1982, *see supra* note 10, or an inference that the parties continued to regard the withdrawal policy as a vehicle for circumventing the SBA's *dividend* restrictions which remained in full force throughout. Thus, the final subsidiary finding made by the Tax Court, like the others, was not clearly erroneous.

### III

### CONCLUSION

Although for the most part the circumstantial evidence was not in dispute and the case is close, a careful review of the entire record leads us to conclude, as discussed, that the predicate findings and inferences relied on by the Tax Court in support of its "constructive dividend" determination were permissible. The Tax Court decision must be affirmed.

*Affirmed.*

---

**10.** Appellant himself testified that the SBA salary cap remained in effect for many years, during which if the officers needed more money it was disbursed "through bonuses or loans," that he was not sure when the restrictions were removed, but that receiving loans and bonuses instead of salary was "the way we went for many, many years. . . ." Had appellant testified instead that he knew that the SBA salary restrictions were no longer in place in 1982, a more plausible argument might be made that the parties' intent changed with the SBA policy, although the continuing existence of the SBA restrictions on *dividends* would be sufficient in any event to support the inference drawn by the Tax Court.