C. F. WILLIAMS AND JEANNE V. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentWilliams v. CommissionerDocket No. 3589-74.United States Tax CourtT.C. Memo 1978-306; 1978 Tax Ct. Memo LEXIS 206; 37 T.C.M. (CCH) 1270; T.C.M. (RIA) 78306; August 8, 1978, Filed *206 During the taxable years 1964 to 1969, inclusive, petitioners, husband and wife, as officers and majority shareholders of three family-owned corporations, withdrew large sums of corporate funds for their personal use, which were entered on the corporate books as accounts receivable and notes receivable. Notes were not issued until May 1967 for some, but not all, withdrawals. Notes were not issued until August 1969 for the remainder. No interest was paid until after August 1969. A third party note was given the corporations by petitioners as repayment for the withdrawals after a reorganization was proposed, but before it was completed. After the reorganization, the note was returned to petitioners in exchange for some of their shares of the acquiring corporation's stock. Held, the amounts withdrawn were not bona fide loans but were informal distributions of taxable dividends. Paul R. Hodgson,Reece B. Morrel and Don E. Herrold, for the petitioners. Michael J. O'Brien, for the respondent. IRWINMEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1964 through 1969 as follows: YearDeficiency1964$ 14,106.98196556,564.75196651,479.39196740,891.79196852,859.76196969,207.45Concessions *207 having been made, the sole issue presented for our consideration is whether certain withdrawals made by petitioners from corporations in which they were stockholders and officers during each of the years 1964 to 1969, inclusive, were bona fide loans or constituted constructive dividends. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference. Petitioners, Clinton F. and Jeanne V. Williams (hereafter Clint and Jeanne), husband and wife, were legal residents of Tonkawa, Oklahoma, at the time the petition herein was filed. They filed timely (with extensions) joint Federal income tax returns with the Internal Revenue Service 1 for the years 1964 through 1969. During the years at issue, Clint and Jeanne together owned majority interests in several corporations. Oil Tool Sales Co. (hereafter "Sales") was incorporated in Oklahoma in 1962. Clint and Jeanne each owned 48 percent of the total outstanding stock of Sales. Oil Tool Manufacturing *208 Co. (hereafter "Manufacturing") was incorporated in Oklahoma in 1954. During the years in issue, Clint and Jeanne each owned between 48 and 49 percent of the total outstanding stock of Manufacturing. Williams Machine Co. (hereafter "Machine") was incorporated in 1953 in Oklahoma. During the years in issue, Clint and Jeanne each owned between 45 and 47 percent of the total outstanding stock of Machine. Clint, Jeanne and Birdie Taylor (an employee) were president, vice president and secretary-treasurer, respectively, of all three corporations during the years in issue and at all times material hereto. The board of directors of both Sales and Manufacturing consisted of Clint, Jeanne, Tamara J. Brooks and Sandra J. Hudack, the latter two being Clint's daughters. The board of directors of Machine consisted of Clint, Jeanne, George Chandler (an employee) and Taylor. The combined salaries received by Clint and Jeanne throughout the years in issue were as follows: $ 32,400 per year in 1964-1966, inclusive; $ 34,200 in 1967; $ 36,000 in 1968; Clint received salaries of $ 7,500 from Sales and $ 24,000 from Manufacturing, (none from Machine) in 1969; Jeanne received a salary of $ 8,400 *209 from Machine and $ 3,600 from Manufacturing (none from Sales) in 1969; or a total of $ 43,500 for both Clint and Jeanne in 1969. Clint was a driving force behind the corporations' success; Jeanne came to the corporations' offices only once or twice a month. During the years in issue, each of the three corporations had accumulated earnings and profits.2 No formal dividends were ever declared or paid by any of the three corporations. During the years in issue, petitioners had substantial personal assets in addition to their stock in Sales, Manufacturing and Machine. 3*210 They each maintained separate personal bank and checking accounts and invested in different activities in varying amounts. Clint and Jeanne kept most of their business interests and income derived therefrom separately, although there were accounts in their joint names on the books of the companies and some overlapping of interests. Throughout the years in question, Clint would withdraw funds from the three corporations for various personal purposes, including personal expenses, investments, legal fees and personal loan repayments.Typically, the companies issued checks to Clint for his withdrawals. The cancelled checks were retained by the corporations and the amounts charged to Clint's personal account. An exception to this method of making withdrawals was four notes issued in 1964 by Clint to Sales. O. D. Shoop had certain items of Sales on consignment; when he sold those goods, he paid Clint the amounts directly ($ 1,328.88, $ 2,702.96, $ 760.48, and $ 712.46). Clint retained the funds, but issued notes to Sales in respect thereof. Clint's personal account with Sales also reflects a debit entry in 1964 in the amount of $ 9,329.42, captioned "Adjusting entry-collections", which also may have related to direct collections of proceeds *211 of sales by Clint, but for which he did not issue notes. In another instance, Clint wrote a countercheck on the account of Sales while out of state. Birdie Taylor, secretary-treasurer of the three corporations, was unaware of this action.When Clint returned, the withdrawal was recorded on the books of Sales as a note receivable from Clint. Although the companies had no requirement that the board of directors authorize loans to employees or customers, Clint or the sales manager made the decisions as to the loaning of funds to employees. Customers of Sales, Manufacturing, and Machine whose accounts were older than one year were generally asked to furnish an interest-bearing note for the balance due on the account. Sales also loaned cash to certain customers. No notes or collateral were given by the customers for these loans nor was collateral obtained. Sales loaned its sales manager $ 3,000. A note was issued providing for seven percent interest. The amount was repaid (by payroll deductions) but no interest was ever paid and no collateral given to secure the note. Manufacturing also loaned money to its employees; no notes were issued, no interest was paid, nor collateral required. *212 These loans, however, were relatively small, ranging from $ 50 to $ 1,620, and were regularly repaid through payroll withholding. An additional $ 1,000 loan was made in 1967 by Machine to George Chandler, an employee. Chandler turned over his stock certificate in Machine for collateral.The certificate was not endorsed, but was not returned until the loan was repaid in 1969. No interest, however, was collected by Machine. Loans made by Machine to other employees were regularly repaid through payroll withholding in the same manner as the loans made by Manufacturing to its employees. In October 1964, Clint purchased with funds withdrawn a half interest in real estate in Canada known as the Raeburn land at a cost of $ 7,508.95. Clint sold this land in June 1967 for $ 9,004.90. None of the proceeds from the sale of the Raeburn land in 1967 was paid to any of the three corporations. In April 1965, Client purchased with funds withdrawn a half interest in Canadian real estate known as the Ericksdale land at a cost of $ 9,936.79. Clint sold this real estate in April 1967 for $ 13,125.56. Again, none of the proceeds of the sale of this real estate was paid to any of the corporations. *213 In October 1965, Clint again purchased land in Canada at a cost of $ 13,560 with funds withdrawn from oneof the corporations. The land was sold in November 1966 on the installment basis and Client received $ 4,480.33 in 1968 and $ 4,479.33 in 1969 from the sale. None of the proceeds received by Client from this sale was paid to any of the corporations. In February 1966, Jeanne purchased a house located at 625 N. Ninth, Tonkawa, Oklahoma for $ 6,165.82, using withdrawn funds in issue in this case. She sold the house in November 1968 for $ 7,700. None of the proceeds from the sale of the house was paid to any of the corporations. Respondent, in his notice of deficiency, determined that Clint and Jeanne received the following amounts of constructive dividends by reason of their withdrawals during the years in issue from each of their three controlled corporations: Oil ToolOil ToolWilliams YearSales Co.Manufacturing Co.Machine Co.Total1964$ 35,834.23$ 29,931.60$ 6,000$ 71,765.83196530,017.4766,419.6120,243116,680.08196655,427.7048,702.04256104,385.74196772,118.12395.573,50076,013.69196866,484.4835,256.7010,000111,741.18196960,270.31 4*214 29,449.966,00095,720.27$ 320,152.31$ 210,155.48$ 45,999$ 576,306.79 5 As of August 1969, and prior thereto, petitioners were aware that their joint income tax returns filed for the taxable years 1964 to 1968, inclusive, had been assigned to an internal revenue agent for audit. During the years 1960 through 1969, petitioners were regularly investigated by the Internal Revenue Service, and petitioners executed Form 872 in April 1968 extending the statute of limitations for the taxable year 1964 and in March 1969 for the years 1965 and 1966. The examination of petitioners' *215 returns for the taxable years 1963 through 1970, inclusive, was actually commenced May 10, 1971. An examination of each of the three corporations' income tax returns for the corresponding years was also commenced at that time. The withdrawals in dispute were treated as receivables on the balance sheets of each of the corporations on their Federal and state corporate income tax returns at all times here relevant as well as on the corporate franchise tax returns for each of the fiscal years ending June 30, 1965 through 1970, inclusive, filed with the Oklahoma Tax Commission. A franchise tax was paid on the withdrawals treated as receivables. Merle P. Bottenfield, petitioners' and the corporations' outside accountant, prepared the Federal and Oklahoma corporate income tax returns and Oklahoma corporate franchise tax returns. He also prepared the financial statements of the corporations. In his opinion, the amounts were properly treated as loans in accordance with generally accepted accounting principles. The amounts were carried in the general ledgers of the three companies under the following various titles: Drawing Account - C. F. Williams; Drawing Account - Jeanne V. Williams; *216 Drawing Account - Mr. & Mrs. C. F. Williams; Notes Receivable - C. F. Williams; Notes Receivable - Jeanne V. Williams; Note Receivable - Secured - C. F. Williams; Note Receivable - Secured - Jeanne V. Williams. The amounts were shown in the financial statements of the three companies as "Accounts & Notes Receivable - Officers & Employees." Bottenfield insisted throughout the years 1964-1967 that notes be issued to the companies by petitioners. It was not until May 1967 that Clint instructed Taylor to determine the amount owed and to prepare notes. Prior to May 1, 1967, no note or other written agreement of indebtedness was executed by Clint or Jeanne with respect to any of the amounts in dispute. No security or collateral of any kind was pledged to secure the repayment of the amounts. No interest rates or schedules for repayment relative to these amounts were agreed upon and no interest was paid. Schedules of Clint's withdrawals as of May 1, 1967, from each of the three companies were prepared from the corporate records by Taylor. On May 1, 1967, Clint executed three demand notes, one each to Sales, Manufacturing, and Machine in the amounts of $ 120,067.08, $ 93,105.78, and *217 $ 25,243, respectively. The face amounts reflected on the notes were less than the balances in the receivable accounts of the three companies due to omissions of substantial amounts of withdrawals from the schedules. No interest was paid or accrued on this additional amount which was not reflected in the notes until July 31, 1969 at which time new notes (in August 1969) were executed. The 1967 notes provided for five percent interest to be accrued until the note was paid, but no interest was ever paid or accrued on them. No schedule of repayment was agreed upon by the parties. Moreover, no collateral or security of any kind was pledged to secure the notes. The notes were posted by Taylor as a debit to the notes receivable account and a credit to Clint's drawing account. In 1969 Clint sold certain Canadian properties and stock which he held in Blue Meadows Ranch to B & L Land & Livestock, Ltd. (hereafter "B & L", a Canadian corporation), Charles Laird and Harold D. Beckwith for cash of $ 20,000 (Canadian funds) to be paid by June 1, 1969, and a 7 percent note for $ 611,150 ($ 655,000 Canadian funds) executed by Laird, Beckwith, and B & L. The $ 20,000 (Canadian) was paid to Sales *218 and credited against Clint's withdrawal account. As security for the note (hereafter B & L note) Blue Meadows Ranch executed a second mortgage on certain lands it owned and also pledged to Clint seven contracts for the sale of real estate, valued at $ 91,081.19. The B & L note called for eleven equal payments of $ 54,885, due January 15 of each year, commencing January 15, 1970, with the remaining balance due January 15, 1981. In August 1969 upon the advice of counsel, petitioners each executed notes to each of the three companies for the entire amount carried on each respective company's books as a drawing account, note receivable account, or account receivable in petitioners' respective names, as of July 31, 1969. No notes had previously been issued for any withdrawals by petitioners from May 1, 1967, the date of the previously issued notes, to July 31, 1969. Net withdrawals considered by respondent as constructive dividends during this period totaled $ 132,495.79 from Sales, $ 64,771.52 from Manufacturing, and $ 16,000 from Machine; no interest was either paid or accrued on these amounts. The 1969 notes provided a repayment schedule, beginning January 15, 1970, and bore six *219 percent interest, but did not include any amount for interest for any withdrawals made prior to July 31, 1969. The notes issued by Clint were secured with 2,292 shares of Sun Oil Company preferred stock and the B & L note. The payment dates on the August 1969 notes issued by Clint coincided with the payment dates on the B & L obligation. The notes executed by Jeanne were unsecured but were signed by Clint as guarantor. Clint pledged the same Sun Oil Company stock as collateral for his guarantee. On August 29, 1969, in a memorandum of action the boards of directors of the three companies agreed to accept the notes and authorized the officers to cancel all prior accounts and notes from Clint and Jeanne. The amounts of the notes exceeded the amounts determined by respondent to constitute constructive dividends (alleged constructive dividends being less than the total net withdrawals of petitioners). 6In October 1969, Smith International, Inc. (hereafter "Smith") contacted Clint concerning a potential *220 acquisition by Smith of Sales, Manufacturing, Machine, and two additional companies, O.K. Heat Treating Co., Inc., and Gruner & Company. 7*221 On December 22, 1969, Sales, Manufacturing and Machine joined in a written memorandum of intent with Smith agreeing in principal to a merger of the several corporations. On January 16, 1970, the memorandum of intent was amended, refining the agreement. The amendment contained the following language relative to the amounts owing from Clint and Jeanne: 2. Loan Repayment:There are notes presently outstanding from C. F. Williams and Jeanne V. Williams in the sum of $ 706,037.54, which Clinton F. Williams and Jeanne V. Williams agree to repay to WILLIAMS, on or before the closing, in the following manner: a) Assignment to WILLIAMS of that promissory note from B & L Land & Livestock Limited, Charles Laird and H. D. Beckwith as promisors in the total amount of $ 655,000.00 Canadian dollars (approximately $ 602,600.00 U.S. dollars at the current rate of exchange). b) Payment to WILLIAMS of the sum of $ 706,037.54 less the amount provided in a) above converted to the current exchange rate. In the Plan of Reorganization and Agreement of February 1970, the shareholders of the three companies controlled by petitioners represented to Smith, to the best of their knowledge and belief, that the accounts and notes (including amounts due from Clint and Jeanne) were binding obligations and collectible at face value. However, the shareholders did not warrant the collectibility of any of the accounts. The agreement set forth the terms, agreements, and conditions of the merger whereby Smith would exchange 90,000 shares of its no-par common stock for all the issued and outstanding stock of the three companies (pursuant to section 368(a)(1)(B)). 8*222 The exchange of the 90,000 shares was based upon the financial condition (and expected profitability) of the three companies as of December 31, 1969. In connection with its acquisition of the companies, Smith submitted a listing application to the New York Stock Exchange on February 27, 1970, containing a balance sheet for each of the companies. Each balance sheet reflected the disputed amount as an account receivable due from officers and employees. The New York Stock Exchange authorized the listing of the shares requested to acquire the three companies. On February 6, 1970, Clint assigned the B & L note to Sales, Manufacturing, and Machine. The three companies credited the note against the accounts of petitioners, although the first required payment ($ 54,885) was in default (by 22 days) at the time of the assignment. The $ 655,000 principal and $ 48,941.42 accrued interest (Canadian funds) remained unpaid on the B & L note at this time. As a result of the assignment of the note, the receivables from Clint and Jeanne, including interest on the August 1969 notes, were credited as paid in full, with the exception of $ 67,945.52 remaining balance on Clint's note to Sales. Additionally, petitioners reported the accrued interest on the B & L note prior to the assignment ($ 45,627.34 in U.S. funds) as interest income *223 on their 1970 income tax return. On March 31, 1970, the Plan of Reorganization and Agreement, pursuant to which Smith acquired all the stock of the three companies, was consummated. On the same day, Clint paid an additional $ 50,000 cash to Sales 9 and Clint and Jeanne issued a new note for $ 64,600.06 to Sales, secured by 1,500 shares of Smith stock, to pay the balance of the note executed by Clint on August 29, 1969, plus interest thereon from August 29, 1969, to March 31, 1970, and some subsequent withdrawals. Prior to this time, neither Clint nor Jeanne executed any note or other written agreement providing for interest, security, or for a repayment schedule relative to amounts withdrawn from Sales after July 31, 1969. While Smith held the B & L note it received one $ 25,000 payment on the principal and no interest. On August 17, 1971, the B & L note and the note executed by petitioners to Sales on March 31, 1970, in the face amount of $ 64,600.06 were returned by Smith to petitioners in exchange for shares of Smith. After reassignment of the B & L note to Clint on August 17, *224 1971, the amount due under the note was refinanced by Blue Meadows Ranch. The refinancing provided for payment of $ 500,000 (Canadian funds) as follows: $ 50,000 on November 15, 1973, $ 200,000 on November 15, 1974, and $ 250,000 on November 15, 1975. It also required an eight percent interest on delinquent payments from the due date until date of payment. The note was continually in default from the time it was returned to Clint on August 17, 1971, to September 30, 1974; Clint received only $ 50,000 on the principal and no interest on the note through September 30, 1975. The notes payable ledger sheets of Manufacturing showed a balance due to petitioners in the amount of $ 175,164.06 at the corporation's inception in 1954. By September 30, 1961, the total amount due petitioners was $ 873.05. No notes were given by Manufacturing to Clint and Jeanne for the $ 175,164.06, nor was there any schedule of repayments, interest paid or accrued by Manufacturing, or collateral given to secure the amount. Both Jeanne and Clint transferred additional amounts to Manufacturing which were similarly reflected on Manufacturing's notes payable ledger sheet. The $ 2,000 Jeanne transferred was *225 returned in December 1959, and the $ 6,000 Clint transferred in January 1962 was returned on August 29, 1969, along with the remaining $ 873.05 balance at September 30, 1961. No notes were given by Manufacturing to Clint or Jeanne for these amounts, nor any interest paid or accrued, collateral given, or schedule of repayment drawn. Soon after Smith acquired the three companies, Clint loaned $ 7,000 to Smith. He did not obtain a note or collateral from Smith, nor did he receive interest on the loan nor did the loan have a schedule of repayment. The amount was repaid the following month. OPINION During the years in issue petitioners withdrew money from three corporations in which they were the majority shareholders. Respondent contends that the net withdrawals should be taxed to petitioners as dividend distributions under the provisions of section 316 (a). Petitioners argue that the withdrawals constituted bona fide loans. The question of whether withdrawals by a shareholder from a corporation constitute loans or constructive dividends is a factual one to be decided after consideration of all the circumstances surrounding the withdrawals, Monette & Co. v. Commissioner,45 T.C. 15 (1965), *226 affd. 374 F.2d 116 (4th Cir. 1967). Specifically, the question is whether there existed an intent at the time of withdrawal by the shareholder to repay the loan and by the corporation to enforce the obligation, Haber v. Commissioner,52 T.C. 255 (1969), affd. 422 F.2d 198 (5th Cir. 1970). Since the corporations were substantially owned by the petitioners, who made the withdrawals in question, such relationship invites careful scrutiny, Baird v. Commissioner,25 T.C. 387 (1955). Initially we note that the burden of proof is on petitioners to show that the amounts in issue were loans and not constructive dividends. Petitioners attempt to reverse their burden by relying on the presumption under Oklahoma law that fiduciaries (including members of a board of directors) have done right, rather than wrong, and that it would have been a violation of their fiduciary duty to have issued dividends solely to Clint and Jeanne. In Roberts v. Commissioner,62 T.C. 834, 837 (1974), we stated, in part: "State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." Burnet v. Harmel,287 U.S. 103, 110 (1932). *227 See Bankers Pocahontas Coal Co. v. Burnet,287 U.S. 308 (1932). Federal law and not State law determines the presumptions to be applied in interpreting the Internal Revenue Code. Robinson v. Commissioner,63 F.2d 652 (C.A. 6, 1933), affirming 21 B.T.A. 1373 (1931), certiorari denied 289 U.S. 758 (1933); Estate of Julian Peabody,41 B.T.A. 1 (1940). Here, state law has no bearing on the determination of dividend status for federal tax purposes. The presumption that directors have met their fiduciary duty is inconsistent with respondent's (indirect) determination in this case that petitioners did not meet their duty, and therefore, the presumption, assuming it is the law of Oklahoma and that issuing dividends would violate petitioners' fiduciary duty, carries no weight in this determination. See also Chism's Estate v. Commissioner,322 F.2d 956 (9th Cir. 1963). Further, we again sustain the objection raised at trial by respondent and sustained at that time to introduction of the revenue agent's report, supplemental report, the letter from the appellate conferee, Form 870 executed by petitioners, and a letter from the Chief of the Appellate Division, as irrelevant and immaterial. *228 The introduction of these exhibits is an attempt by petitioners to prove respondent admitted that the assignment of the B & L note constituted repayment of the loans. However, it has long been held that such reports are not competent proof of the facts stated therein. Clark v. Commissioner,266 F.2d 698 (9th Cir. 1959), affirmingT.C. Memo. 1957-129, on this issue, remanded on other grounds; Series "A" Trust v. Helvering,126 F.2d 530 (D.C. Cir. 1942); Fitzner v. Commissioner,31 T.C. 1252 (1959); Blundon v. Commissioner,32 B.T.A. 285 (1935). Finally, petitioners strenuously argue that because respondent failed to cross-examine Clint when he testified that he intended the withdrawals to be loans and to repay the withdrawals, that respondent admitted such testimony was true. Petitioners cite Pearl v. Commissioner,T.C. Memo. 1977-262. The testimony of the taxpayer is, of course, a factor to be considered. Estate of Benjamin v. Commissioner,28 T.C. 101 (1957). In Pearl,supra, respondent failed to cross-examine petitioner as to the issue of repayment and the Court, therefore, had no reason to doubt the petitioner's testimony that there was repayment: We are convinced by the record *229 that the withdrawals in question were always intended by the parties to be loans. Both Pearl and Eisner testified that the withdrawals were loans and were to be repaid by Pearl. Additionally, Pearl testified that the withdrawals were all finally repaid to petitioner. Respondent failed to cross-examine Pearl on this point during trial, and this failure leads us to conclude that this testimony was accurate. Although uncorroborated testimony by a taxpayer may be sufficient evidence on which to base a finding contrary to respondent's determination and this Court may "not arbitrarily discredit and disregard unimpeached, competent and relevant testimony of a taxpayer which is uncontradicted," A & A Tool & Supply Co., v. Commissioner,182 F.2d 300 (10th Cir. 1950), this Court "is not bound to accept testimony at face value even when it is uncontroverted, if it is improbable, unreasonable or questionable." Banks v. Commissioner,322 F.2d 530 (8th Cir. 1963), affg. in part and remanding in partT.C. Memo. 1961-237; Urban Redevelopment Corp. v. Commissioner,294 F.2d 328 (4th Cir. 1961), affg. 34 T.C. 845 (1960); Factor v. Commissioner,281 F.2d 100 (9th Cir. 1960), affg.T.C. Memo. 1958-94; *230 Archer v. Commissioner,227 F.2d 270 (5th Cir. 1955), affg. a Memorandum Opinion of this Court dated Feb. 18, 1954. See also Commissioner v. Smith,285 F.2d 91 (5th Cir. 1960), affg.T.C. Memo. 1958-210. In Pearl, the testimony was uncontroverted and petitioner was credible. Moreover, in the circumstances described in the foregoing excerpt from Pearl, the testimony that there was repayment could have been easily challenged; the testimony as to intent could have been challenged only indirectly, by looking to surrounding circumstances such as actual repayment, security for the withdrawals, whether notes were issued, etc. This is exactly what respondent did in the instant case. See Alterman Foods, Inc. v. United States,505 F.2d 873 (5th Cir. 1974). Clint and Jeanne each owned an equal number of shares in Sales, Manufacturing and Machine, the combination of which comprised virtually all of the outstanding shares of stock of each of the three corporations. Clint was the president of each corporation and Jeanne was the vice-president.They served on the board of directors of each corporation but Jeanne visited the corporate offices on the average of only once or twice a month. Clint *231 was the driving force behind the success of the corporations. The withdrawals by petitioners from the three corporations from 1964 to 1969 were entered on the books of the various corporations as debits to various receivable accounts. The withdrawals were used by petitioners for personal investments and other personal expenditures. Prior to May 1, 1967, no note or other written agreement of indebtedness covering these withdrawals was executed and no schedule for repayment was agreed upon. No interest was charged petitioners and none was accrued on the books of any of the corporations. Clint and Jeanne had been warned regularly by their accountant to issue notes, and on May 1, 1967, Clint executed three demand notes, one each to Sales, Manufacturing and Machine, in the face amounts of $ 120,067.08, $ 93,105.78, and $ 25,243, respectively. Initially, it is significant that the notes did not include all the unpaid withdrawals by petitioners from the three corporations as of May 1, 1967. The three notes were unsecured. Moreover, although the notes bore interest at the rate of five percent per annum, no interest was ever paid by Clint on these notes, nor was any interest ever accrued *232 on the books of any of the three corporations. Credits were entered on the books of the three corporations against the receivable accounts as a result of the execution of the May 1, 1967, notes by Clint. Corresponding debits were entered in notes receivable accounts. The demand notes executed in May 1967 by Clint are of little significance, however, not only because they were unsecured and because no interest was ever paid or accrued on them, but also because the discretion of making demand for the payments was effectively vested in the same person who is contending he was obligated to make them. Moreover, instead of making payments on the notes, petitioners continued making additional withdrawals after May 1, 1967, the date of the notes. Net withdrawals by petitioners from Sales, Manufacturing and Machine from May 1, 1967, to July 31, 1969, were $ 132,495.79, $ 64,771.52, and $ 16,000, respectively. However, prior to August 29, 1969, no note or other written agreement of indebtedness was executed by either petitioner with respect to these withdrawals and no repayment schedule was agreed upon. Furthermore, no interest on these withdrawals was ever paid, nor was there any interest *233 ever accrued on the books of the corporations. On August 29, 1969, new notes were executed by Clint and Jeanne for the entire debit balances in all receivable accounts due from petitioners on the books of Sales, Manufacturing and Machine. The August 29, 1969, notes included no interest for any withdrawal made prior to July 31, 1969. Clint and Jeanne each executed one note to each of the three corporations. In Jeanne's case, these were apparently the first notes executed for any withdrawals made by her from any of the corporations since 1964. Clint secured the August 29, 1969, notes to the three corporations with the B & L note in the face amount of $ 655,000 (Canadian funds) which had been executed in favor of Clint in April 1969. Clint also guaranteed payment of the August 29, 1969, notes executed by Jeanne to the three corporations and secured his guaranty with 2,292 shares of preferred stock of Sun Oil Company. The notes called for interest at the rate of six percent per annum on the unpaid balance with principal payments on each note commencing January 15, 1970 and coinciding with payments due on the B & L note. This entire sequence of events casts doubt as to the bona *234 fides of the loan. Notes were not issued for many years; when they were, there was never any attempt to enforce collection; no interest was paid (except amounts accrued after August 29, 1969), nor was collateral given until the August 29, 1969 notes were executed. The treatment of the withdrawals on the corporate books and on tax returns, while a factor to be considered, is not controlling since book entries and records may not be used to conceal a situation which is not in economic reality what it is made to appear. Kaplan v. Commissioner,43 T.C. 580, 595 (1965). Credits against the receivable accounts of Clint and Jeanne on the books of Sales, Manufacturing and Machine during the period 1964 through 1969 were relatively nominal, whereas during this same period petitioner had a substantial net worth. Failure to repay where the shareholder has sufficient assets to make repayment supports a finding that withdrawals represent a distribution of earnings and not loans, unless petitioners can offer an explanation of why they did not make repayment. We can find no credible explanation in the record. Tollefsen v. Commissioner,52 T.C. 671 (1969), affd. 431 F.2d 511 (2d Cir. 1970), *235 cert. denied 401 U.S. 908 (1971). Similarly, the use of withdrawals from a closely held corporation to purchase an asset later sold, the proceeds of which are not paid to that corporation, also indicates that withdrawals are not to be used for a specific purpose, but rather for the general continuing use of the shareholders. Cf. Baird v. Commissioner,supra at 395. Both Clint and Jeanne used withdrawals to purchase certain properties which they later sold at a profit, yet none of the cash from such sales was returned to the corporations. Moreover, the fact that the individual debit balances were allowed to mount steadily each year without any substantial payments for more than six years, until they reached a total net withdrawal of over $ 500,000, is inconsistent with an intent to borrow and repay. Cf. Baird v. Commissioner,supra.Between 1964 and 1969, Manufacturing and Machine regularly loaned funds to their employees in relatively small amounts. Although no notes or collateral were given for these loans, nor interest charged, they were repaid regularly through payroll deductions. Customers of Sales, Manufacturing and Machine whose accounts were older than one year were asked *236 to furnish an interestbearing note for the balance due on the account. Notes were often furnished by customers and interest paid. Finally, in either 1970 or 1971, Clint loaned $ 7,000 to Smith International, Inc. The loan was repaid to Clint within one month after it was made. This contrast between petitioners' withdrawals and advances to non-shareholders, indicates that the corporations lacked intent to require repayment from their controlling shareholders. Levy v. Commissioner,30 T.C. 1315, 1327 (1958). Admittedly, there were certain cash loans to customers for which no notes were issued, no collateral secured, nor interest charged. However, there may have been sound business reasons for making the loans to customers, and for all the record indicates, such procedures with customers may have been the ordinary manner of doing business in the trade. We are also aware that Clint and Jeanne handled certain advances they made to the corporations informally. In any event, we consider these factors relatively insignificant compared with the size and pattern of advances to petitioners, who themselves were in effective control over the corporations' intentions and actions with respect *237 to requiring repayment.For the years 1964 through 1968, the total salaries of petitioners from the three corporations were $ 32,400, $ 32,400, $ 32,400, $ 34,200, and $ 36,000, respectively. In 1969, Clint drew no salary from Machine, $ 24,000 from Manufacturing, and $ 7,500 from Sales. In 1969, Jeanne drew no salary from Sales, $ 3,600 in salary from Manufacturing, and $ 8,400 from Machine. In contrast, the corporations never issued any dividends, despite a large surplus of earnings and profits with no specific or identified need to retain such large sums. This is one more indication that petitioners attempted to have the use of corporate earnings without having to pay a tax on their receipt. 10In form, Clint and Jeanne seemingly repaid the accounts due the three companies by the $ 20,000 payment in June 1969; the assignment of the B & L note on February 6, 1970; the $ 50,000 cash payment and execution of the $ 64,600.06 note to Sales on March 31, 1970, which Smith's acquisition of Sales. First, we note that "repayment" was made after petitioners were aware that their income tax returns were to be audited, albeit before the *238 audit actually commenced. This reduces the weight to be given the repayment as evidence of an intent to repay. Cf. Tollefsen v. Commissioner,supra at 680. Also, the fact that petitioners paid tax on the assignment of the note has little relevance. A taxpayer's return is a self-serving declaration and has little or no probative value without proof of the surrounding circumstances. Watab Paper Co. v. Commissioner,27 B.T.A. 488, 506 (1932), petition to review dismissed on stip. 68 F.2d 998 (8th Cir. 1933); Goodman v. Commissioner, a Memorandum Opinion of this Court dated December 18, 1946, affd. sub. nom. Heyman v. Commissioner,176 F.2d 389 (2d Cir. 1949), cert. denied 338 U.S. 904 (1949). There is another reason which we believe shows that the repayment should not be considered as evidence of an intent to repay. Repayment was not made until after the proposed merger. Upon merger, Clint and Jeanne received Smith stock which was publicly traded on tae New York Stock Exchange and which could have easily been sold for cash. Since the amount of Smith stock petitioners received on the exchange reflected the value of petitioners' note, they would be able to immediately have cash for *239 the value of their notes (even prior to payment). Thus, petitioners were aware that even if they made repayment they would immediately receive back, in stock, the value of the notes. They, therefore, never lost personal control of the withdrawn funds. 11*240 We note, moreover, that by arranging the repayment in this manner, the interests of the minority shareholders after the merger were apparently not diminished by the dividends to Clint and Jeanne, as they would otherwise have been if the withdrawals had actually been withdrawn as dividends. This is so because Smith paid each shareholder his or her proportionate amount on the basis of the companies' values pre-dividend; only Jeanne's and Clint's net proceeds from the Smith merger were ultimately reduced as a result of their previous withdrawals. In any event, we do not believe that the interests of the various shareholders were truly adverse. There was testimony that Jeanne was concerned about Clint's withdrawals, but no action ever came of it. Moreover, Clint guaranteed Jeanne's accounts to the company, and credited both their accounts with the assignment of the B & L note. Nor would the fact that withdrawals are disproportionate to shareholder interests necessarily destroy dividend status. Roschuni v. Commissioner,29 T.C. 1193, affd. per curiam 271 F.2d 267 (5th Cir. 1959). *241 Thus, neither the language used nor the formalities followed by the parties preclude us from determining the true nature of the transaction. Baird v. Commissioner,supra.Petitioners have cited numerous cases to support their contentions, but we find all of them to be distinguishable. Decision will be entered for respondent. Footnotes1. It is unclear from the record where the returns were filed, but for each of the years in issue, petitioners' residence was Tonkawa, Oklahoma.↩2. For example, as of the dates indicated, the earned surplus of Sales was as follows: ↩ DateEarned SurplusDateEarned Surplus9-30-65$ 42,441.319-30-68$ 217,450.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,061.319-30-69425,042.549-30-67126,601.7912-31-69548,630.093. The combined net worth of petitioners as of December 31 of each of the years 1963 to 1969, inclusive (excluding amounts allegedly constituting constructive dividends and petitioners' stock in the three companies) was as follows: ↩1963$ 755,615.111964671,030.921965868,921.731966951,632.3319671,027,954.0419681,228,371.8519691,375,876.304. On October 9, 1965, Clint withdrew $ 46,500 from Sales. This was not included in petitioners' income by respondent as a constructive dividend. Sales offset $ 20,000 against the $ 46,500 in June 1969. The $ 20,000 credit by Sales for "payments" in June was also credited by respondent as offsetting in part the total of $ 83,962.77 withdrawn by petitioners from Sales in 1969. 5. Includes credits by Sales with respect to cash repayments of $ 8,000 in 1964, $ 13,525.09 in 1966, $ 7,700 in 1967, $ 4,000 in 1968, and $ 23,962.77 in 1969. No cash repayments were made to the two remaining companies in any years, nor were any credits given for any notes executed by Clint or Jeanne to the companies.↩6. The difference is apparently attributable to respondent's difficulty in locating all the withdrawals, not to any intent by respondent to concede that certain withdrawals were loans.↩7. O.K. Heat Treating Co., Inc., was also owned by petitioners at the time Smith first contacted Clint. These four companies were referred to as "WILLIAMS" in the negotiations and in the memorandum of intent. The merger was contingent upon petitioners' ability to deliver to Smith the assets of Gruner & Co., however, which they did not own at that time.8. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years at issue.9. This $ 50,000 represented the proceeds petitioners received from Smith for the sale of Gruner & Co.↩10. Granzotto v. Commissioner,T.C. Memo. 1971-106↩.11. Respondent argues that we should apply the steptransaction doctrine to collapse the sale and the return by Smith of the B & L note (and the March 31, 1970 note evidencing the remainder due) in exchange for the portion of the Smith stock petitioners had received upon the merger. If the two steps are taken together as one transaction, the net effect is Smith's acquisition of the three companies for an amount of Smith stock equal to the value of the three companies, less the value of the receivables due them from petitioners; petitioners have a net total of Smith stock worth the same amount as were their corporations, less the amounts they owed. In economic terms, there would be no repayment. Petitioners argue that since respondent first made this contention on brief, but never alleged this in his answer or in any amendment thereto, he is prevented from raising the argument. We do not reach any of the parties' contentions on this point since we have already ignored the repayment as a factor to be considered in determining intent in this case.