GEORGE FAIST AND DOLORES FAIST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Faist v. Commissioner
Docket No. 869-79.
United States Tax Court
T.C. Memo 1980-354; 1980 Tax Ct. Memo LEXIS 229; 40 T.C.M. (CCH) 1128; T.C.M. (RIA) 80354; September 3, 1980, Filed *229 Petitioner received advance of money from his solely owned corporation. The advances were treated as loans on the books of the corporation, and the corporation reported accrued interest on its annual tax returns. Based on all the facts, petitioner had the requisite intent to repay the advances. Held: The advances were intended as loans and not dividends. Michael R. Fink and Andrew H. Lynette, for the petitioners. Patrick E. Whelan, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent, on October 20, 1978, issued a statutory notice in which he determined deficiencies *230 in petitioner's Federal income taxes as follows: Year
Amount
1973
$40,992.79
1974
81,876.28
1975
27.80
The sole issue for our determination is whether certain distributions made by Fairway Development, Inc. to petitioner constitute tax free loans or dividend income under sections 301 and 316, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners George and Dolores Faist, husband and wife, resided in Spring Valley, New York at the time they filed their petition herein. Petitioners timely filed joint Federal income tax returns for the calendar years 1973, 1974 and 1975 with the Brookhaven Service Center, Holtsville, New York. As Dolores Faist is a party hereto solely by virtue of having filed jointly with her husband, petitioner shall refer only to George Faist. Prior to 1973 petitioner conducted his business through various entities. Fairway Park, *231 Inc. was incorporated in November 1967. It was merged, effective August 31, 1973, with Sandstone Farms, Inc. at which time Fairway Park, Inc., the surviving corporation, changed its name to Fairway Development, Inc. (Fairway Development). All of these corporations were controlled by petitioner as the substantial majority stockholder prior to August 31, 1973, and as the sole shareholder subsequent to that date. All of the corporations were accrual method taxpayers. At various times prior to the merger petitioner also owned, as sole shareholder, Germonds Holding Corp. and Highview Acres, Inc. Subsequent to September 1, 1973, however, he dealt only through Fairway Development or in his own name. Since 1955, petitioner had been involved personally and through his various corporations almost solely in the real estate acquisition, development and construction industry. To finance his corporate and personal enterprises, petitioner relied on a combination of bank loans and transfers of funds from and to his corporations. During the years prior to 1973, he received money from and advanced money to the various corporations in which he was the sole or substantial majority shareholder. *232 All advances between petitioner and any of his corporations, including Fairway Park, Inc.; Germonds Holding Corp.; Highview Acres, Inc.; Sandstone Farms, Inc.; and Fairway Development, Inc., were reflected as "loans" on the books of the appropriate corporations. Further, both the corporations' and petitioner's financial statements which were prepared to support applications to banks for loans, treated all advances other than salary as existing debts or assets. During the years in issue, petitioner continued to take advances from Fairway Development. The corporation continued the practice of recording advances as "loans" on its books and financial statements. Petitioner continued to record the advances as "loans" on his personal financial statements. A summary of the outstanding balances owed by [to] petitioner to [from] his corporations follows: Total amount of repayment due from
Date of Statement
[due to] G. Faist
Fairway Park, Inc.
Sept. 30, 1968
$0
July 31, 1970
34,349.73
Aug. 31, 1970
42,910.08
Nov. 30, 1971
14,578.38
Aug. 31, 1972
53,978.84
Dec. 31, 1972
36,579.00
Aug. 31, 1973
[46,308.48]
Germonds Holding Corp.
July 31, 1970
$[9,505.00]
Sept. 30, 1970
[9,505.00]
Feb. 28, 1971
[9,005.00]
May 31, 1971
[8,505.00]
Highview Acres, Inc.
Jan. 31, 1969
$ 649.31
July 31, 1969
10,999.31
Jan. 31, 1970
[275.69]
Jan. 31, 1971
[17,155.69]
Jan. 31, 1972
844.31
Sandstone Farms, Inc.
Nov. 30, 1971
$[8,505.00]
Feb. 29, 1972
[7,025.00]
Dec. 31, 1972
19,205.00 (George Faist Professional
Building)
76,859.31 (George Faist Personal)
Fairway Development, Inc.
Sept. 1, 1973
$169,757.00
Feb. 28, 1974
422,377.07
Aug. 31, 1974
560,051.94
Aug. 31, 1975
623,577.64
Nov. 30, 1975
626,118.11
*233 Loan formalities were not observed at any time before or during the years in issue. No promissory notes were ever prepared or executed, nor was a schedule for repayment ever specified. Petitioner did not put up any collateral for the repayment of his withdrawals from the corporations. Determination of the rate of interest to be accrued on each loan was left by petitioner to his accountant on the assumption that the rate would be "fair and acceptable." Interest was accrued on the books of each corporation at a rate of 7 percent and kept in a separate account receivable denominated as interest on loans. During years prior to 1973, such interest was reported as income by the appropriate corporations on their corporate income tax returns, and taxes thereon were paid to the extent, if any, taxable income warranted the payment of taxes. During the years in issue the same practice was continued. Accrual of interest by Fairway Development for the taxable years ended August 31, 1974 and August 31, 1975 did not result in payment of any corporate tax due to substantial reported losses. For the years from 1969 to 1975, petitioner, a cash method taxpayer, did not pay the accrued interest *234 and did not take any interest deduction on his individual income tax return for interest paid on the loans from his corporations. During the period from 1969 to 1975, petitioner's building operations were expanded greatly. Revenues rose from nearly $1,000,000 per year in the period before 1971 to approximately $5,000,000 in 1973 or 1974. Petitioner's frequency of making advances to and from his corporations, and the amount of advances, increased substantially along with the increase in revenues to petitioner's corporations. Petitioner's advances from his corporations were his primary source of funds for the acquisition of real properties to be subdivided and developed with single family and multiple family dwellings, office buildings, and light industrial buildings. The only advance of funds which was not used for the acquisition of land was the purchase by petitioner for $80,000 of an 80 percent partnership interest in Dunbar-Faist Proche/Audi dealership in Spring Valley, New York. The dealership was projected by Worldwide Volkswagen, the franchisor, to return the initial investment as well as provide income for distribution to petitioner of $127,000 during a 5-year period. *235 Due to petitioner's limited assets, bank loans to finance acquisitions were used less frequently than advances from his corporations. For example, Fairway Park, Inc. and Sandstone Farms, Inc., both prior to the merger as well as in 1973 and 1974, borrowed sums of over $100,000 at a time from both Chemical Bank, N.A. and Citibank, N.A. for the financing of development projects. Petitioner acquired certain properties with the intention of owning them personally rather than transferring title to Fairway Development. In most instances, petitioner acquired property in his own name by taking an option on land or purchasing it outright. By so doing he was able to take advantage of his favorable reputation in the community for acquiring property and obtaining government subdivision approval. He would then process the land through the planning boards and town zoning boards until such time as it was appropriate to begin construction. At that point, petitioner and his accountant would decide either to transfer the property to one of his corporations or to retain ownership in his own name and hire one of his companies to do the construction. Among the assets petitioner purchased *236 with an intent to retain ownership in his own name were the Faist Professional Building and the Charlestown Valley Airport lease with option to purchase. Land and construction costs for the Faist Professional Building were paid with a $500,000 bank mortgage and with advances from Fairway Development. As funds were needed during the construction of the Faist Professional Building, they would be advanced to petitioner by a check drawn on the Fairway Development account payable to petitioner. The check would then be deposited in a separate bank account in petitioner's name and the proceeds would be used to pay subcontractors on the building. Alternatively, Fairway Development would pay expenses that arose in the construction of Faist Professional Building and would charge such advances on the books of Fairway Development as a loan to petitioner personally. At least a portion of petitioner's initial investment in the Clarkstown Valley airport, in the approximate amount of $100,000, came as an advance from Fairway Development. Petitioner held the Airport lease in his own name. Assets owned by petitioner during the years in issue were as follows: Percentage of Ownership
Faist Professional Building
100
Clarkstown Valley Airport, Inc.
50
lease with option to purchase
Monterey Gardens, including Black Oaks
100
subdivision
Abate property, Sloatsburg, N.Y. contract
100
to purchase with title taken in
Fairway Development, Inc.
McGrath property
100
Dunbar-Faist Porche/Audi dealership
80
Construction equipment
Residence
*237 Some of those assets were appraised at the following values in 1973 and 1974: Appraised
Value
Mortgage
New Worth
Faist Professional Bldg.
$665,000
$500,000
$165,000
Clarkstown Valley Airport
959,414
479,707
lease 50% interest
Residence
75,000
25,000
50,000
$694,707
As of 1973 the lease on the Clarkstown Valley Airport had been assigned to the Empire Bank to secure a loan for $550,000 for airport improvements.
During the years in issue, petitioner reported gross income, exclusive of capital and partnership losses, of $39,307.58, $39,512.06, and $44,099.62, respectively. With respect to repayment of the advances, prior to September 1, 1973, petitioner contributed real property to Fairway Park, Inc. valued at $33,000, which was credited as a reduction of his loan account. Subsequent to August 31, 1973, petitioner made repayments in cash to Sandstone Farms, Inc. and Fairway Development as a merged entity as follows: Account recorded in
Date
Amount
Personal loan
11/30/73
$ 2,800
Personal loan
12/31/73
15,000
Personal loan
7/74
20,000
Personal loan (paid
3/24/76 *
8,050
to Citibank)
Professional Building
4/2/75
2,500
Professional Building
5/75
1,675
Professional Building
2/28/78
1,500
Professional Building
6/13/76
1,700
$53,225
*238 As a result of the inability of Fairway Development to meet its financial obligations in late December 1974, a meeting was called by its creditors for mid-January 1975. Prior to that meeting, petitioner met with representatives of Citibank, N.A. and arranged for additional financing for Fairway provided that an arrangement could be made with the creditors not to institute collection procedures on their claims. Eventually, as a result of a nonjudicial composition of the creditors of Fairway Development, their claims were settled by payment to unsecured creditors of forty-five cents on the dollar. Fairway Development obtained the funds to make this payment from the proceeds of a $1,442,000 loan from a consortium formed by Citibank, N.A. and Chemical Bank, N.A. In consideration for that loan petitioner was required to guarantee Fairway's loan obligation to the banks and to pledge all of their respective and joint assets, which consisted of raw land, developed land, equipment valued at $50,000, their stock in Fairway Development, and their residence. The $1.4 *239 million loan made by the banks included an existing but outstanding loan from the banks of $800,000 to Fairway Development. That $800,000 loan was composed of $300,000 from Chemical Bank, N.A. and $500,000 from Citibank, N.A. The banks made the $1.4 million loan in part to increase the probability that they would collect on the original $800,000 loan. A projection, on which the consortium of banks relied in granting the $1.4 million loan, reflected that for a 7 month period from January 17, 1975 Fairway would earn $761,305 after expenses, which would be available for repayment of that loan amortization. That projection was based only on the construction of the single family home projects and not on other projects. During the years in issue economic conditions in the real estate market precluded ordinary development and sales over an extended period of time, thus inhibiting petitioner's ability to repay the advances taken from his corporations and to liquidate the $1.4 million bank loan. Fairway Development made no effort to collect the advances in the approximate amount of $560,000 due from petitioner in August 1974. In 1977, the Faist Professional Building, which was still *240 owned personally by petitioner, was sold by Chemical Bank pursuant to its construction mortgage for less than $550,000--about $115,000 less than its 1973 appraised value. At the time of trial, December 4, 1979, Fairway Development was still in existence as a corporation, but was inactive. A substantial portion of the $1.4 million bank loan remained unpaid. Of the assets pledged by the petitioner to secure the loan, he continued to own his personal residence, his interest in the Clarkstown Valley Airport, and his tools and equipment. OPINION During 1973, 1974 and 1975 petitioner withdrew approximately $625,000 from his closely held corporations. The only issue for our consideration is whether advances to petitioner from his wholly owned corporations should be treated as loans or as dividends. If the transfers were bona fide loans, they are of course not taxable to petitioner. On the other hand, if they were distributions by the corporation for his personal benefit, they are taxable as dividends to the extent provided for under sections 301 and 316, I.R.C. 1954. Ross Glove Co. v. Commissioner, 60 T.C. 569, 595 (1973); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). *241 Petitioner points to certain facts which he contends establish that the withdrawals were truly nontaxable loans. Respondent retaliates by highlighting other facts which call for a conclusion that the withdrawals were in fact dividend distributions. Whether the advances were loans or dividends depends upon the taxpayer's intent at the time the advances were made. To support a finding that the advances were loans, petitioner must satisfy a subjective test of showing that the parties intended to create bona fide indebtedness that the shareholder intended to repay and the corporation intended to collect. Chism's Estate v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Commissioner v. Makransky, 321 F.2d 598, 600 (3d Cir. 1963). The issue is purely a factual one to be determined by a consideration of all the facts and circumstances. Because respondent's allegation of a taxable distribution is presumptively correct, the burden is upon petitioner to prove his case by a preponderance of the evidence. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and *242 Procedure.
An inquiry into the subjective intent of petitioner to repay the advances requires an examination of testimony of witnesses and of objective indicia of intent. Such objective factors include: (1) whether the transferor corporations were closely held and controlled; (2) whether notes were executed; (3) whether the purported obligations were secured by collateral; (4) whether there were fixed dates or a schedule for repayment; (5) whether interest was paid or accrued; (6) whether there was a limit on the amount that could be advanced to a shareholder; (7) whether the corporation took steps to collect on overdue "loans;" (8) whether any part of the advances were repaid; (9) whether the transferee had the ability to repay; (10) how the transfers were treated on the books and records, tax returns and financial statements of the corporation and the shareholder; (11) whether there was specific business purpose for making the advances; (12) whether the corporation had a history of paying dividends; (13) whether the corporation had earnings and profits available to pay dividends; and (14) whether advances to stockholders were made in proportion to their stockholdings. [2] See *243 Alterman Foods, Inc. v. United States, 505 F.2d 873, 877 n. 7 (5th Cir. 1974), affg. an unreported Dist. Ct. Opinion, N.D. of Ga. (32 AFTR 2d 73-5946 (1973); 73-2 USTC par. 9792) reh. den. 509 F.2d 576 (5th Cir. 1975); Berthold v. Commissioner, 404 F.2d 119, 121 (6th Cir. 1968), affg. a Memorandum Opinion of this Court; Pierce v. Commissioner, 61 T.C. 424, 431 (1974). None of these factors, alone, compels a finding in this case that the advances in question were either loans or dividends. The factors are merely guideposts to help the Court determine whether repayment was actually intended. Inferences of such intent can be drawn from the totality of the evidence. As applied to the instant facts, we conclude that the withdrawals at issue were indeed intended as loans. In so concluding, we confess that we view the facts as being almost in equilibrium. Yet we must resolve the matter and we give a slight nod, sufficient to carry the requisite *244 burden, to petitioner. In petitioner's favor is the fact that the advances were carried as loans on the corporate books. Petitioner testified, and his accountant corroborated the testimony, that this notation on the corporate books truly represented his intent that the transfers be deemed a loan. See Gurtman v. United States, 237 F. Supp. 533, 536 (D.N.J., 1965) (corporate advances found not to be loans where corporation failed to list advances as loans receivable on its financial statements and shareholder did not record advances as liabilities on applications to banks for personal loans). Further, there was testimony that financing real estate development by way of book entries representing intra-corporate loans was common in the industry. Certainly there was a business purpose to each of the loans. While the execution of notes would have strengthened petitioner's argument in this case, the actual significance of the sole shareholder failing to execute a note in favor of his own corporation is not substantial. Notes by themselves do not create an indebtedness, but are only the evidence of a debtor-creditor relationship that already exists. Where, as here, *245 the formality of executing promissory notes was omitted, the Court will not draw any scale-tipping inference. Nor are we particularly disturbed by the fact that no specified interest rate was set forth. Petitioner and his accountant, both of whom we found to be credible witnesses, testified that the parties intended that a reasonable interest rate would be charged. In each of the years in issue, the accountant accrued interest at the rate of 7 percent per year on the books of the corporation, which was in line with the prevailing interest rates of the time. The absence of a precise maturity date is of more concern. However, we are impressed with petitioner's testimony that each advance from Fairway Development would be repaid, with interest, upon completion and sale of the project for which the money was borrowed. This seems plausible. In all, some $42,000 was repaid during the years before the Court. We think that these repayments support an inference that the advances were intended to be genuine loans. Further, we note that petitioner had a substantial net worth in 1973 and 1974 from which repayment could be anticipated. We are also impressed with the fact that the *246 lending corporation did accrue the interest as income on its tax returns. While it is not entirely clear whether this inclusion attracted a tax, at a minimum it reduced any loss carry forward. Further, in support of our conclusion we cite the testimony of a Chemical Bank official who reviewed Fairway Development's loan applications and the testimony of the corporation's attorney who dealt with the creditors in 1974 and 1975 in connection with the nonjudicial composition. Both stated that the advances to petitioner were given credence as bona fide loans and were considered valid enforceable debt. Considerable weight must be given to this detached testimony. We acknowledge that the amount of the loans, some $626,000, was substantial. Yet the escalation in the loan balance from about $170,000 in 1973 to $626,000 in 1975, paralleled the increase in gross revenues, which rose over the years from about $1 million per year in 1971 to $5 million in 1975. While the amount of actual repayment, totaling about $53,000 including repayments in years after those in issue, was relatively minimal, we recognize that the real estate market crunch of 1974-75 precluded ordinary development and *247 sales and represented an unanticipated hinderance to timely repayment. All in all, we accept petitioner's testimony that repayment was intended at the time the advances were taken. We conclude, therefore, that the transfers were intended as bona fide loans. Decision will be entered for the Petitioners. Footnotes
1. A decision for respondent would necessitate an automatic adjustment with respect to petitioner's claimed sec. 213 deduction for 1974.↩
*. Contract to sell property from which monies were derived executed on Jan. 30, 1976 prior to respondent's audit.↩
2. See also Johnson v. Commissioner, T.C. Memo. 1979-7; Gamble Construction Co. v. Commissioner, T.C. Memo. 1978-404↩.